FILED
2004 Dec-07  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

04 DEC -7 PM 3:59

U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **WILLIAM GLENN BOYD,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-00-S-2919-E** |
| ) | |
| **MICHAEL HALEY, Commissioner** ) | |
| **of the Alabama Department of** ) | |
| **Corrections,** ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION

### TABLE OF CONTENTS

I.      Introduction ................................................................ 1

II.     Factual and Procedural Background ......................................... 1

III.    The Claims Presented for Review........................................... 29

IV.     Discussion................................................................. 34

        A.      Abandoned Claims ............................................... 39

        B.      Ineffective Assistance of Trial Counsel Claims ......................... 40

                1.      Failure to investigate and present mitigating evidence to the jury during the
                        penalty phase of trial (Claim A in Petition) ......................... 43

                        a.      Was the performance of Boyd's attorneys
                                objectively deficient? ................................... 44

                        b.      Did the failure to present more mitigating evidence during the penalty
                                phase prejudice Boyd? ................................... 60

                2.      Failure to attempt to secure a sentence of life without parole from trial judge

(Claim B in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.  Alabama's scheme for compensating attorneys appointed to represent
    defendants accused of capital offenses compromised the performance of
    Boyd's attorneys (Claim H-1 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

4.  Failure to seek expert assistance for the pretrial, trial, and sentencing
    proceedings (Claim H-2 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

5.  Failure to preserve Boyd's right to be free from double jeopardy
    (Claim H-3 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

6.  Failure to object to the prosecutor's racially discriminatory pattern of
    peremptory strikes (Claim H-4 in Petition). . . . . . . . . . . . . . . . . . . . . . . . . 83

7.  Failure to adequately cross-examine and otherwise impeach the credibility of
    key state witnesses, including Robert Milstead, Kenny Surrett, and the state's
    forensic experts (Claim H-5 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . 86

8.  Failure to devise a strategy for saving Boyd from a capital murder conviction
    (Claim H-6 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

9.  Failure to object to erroneous instructions given by the trial court at the
    guilt/innocence phase of trial (Claim H-7 in Petition) . . . . . . . . . . . . . . 100

10. Failure to object to prosecutorial misconduct
    (Claim H-8 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

11. Failure to object to improper victim impact testimony
    (Claim H-9 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

12. Failure to request a transcription of critical portions of the proceedings
    (Claim H-10 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

13. Failure to properly object to the use of electrocution in Alabama as cruel and
    unusual punishment (Claim H-11 in Petition) . . . . . . . . . . . . . . . . . . . . . 125

14. Failure to object to excessive security measures in the courtroom that were
    prejudicial to Boyd (Claim H-12 in Petition) . . . . . . . . . . . . . . . . . . . . . . 127

15. Failure to prepare adequately for pretrial hearings
    (Claim H-13 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

|       | 16. | Allowing improper and prejudicial evidence to be admitted (Claim H-14 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130 |
|       | 17. | Failure to object properly to the imposition of the death penalty in this case pursuant to a pattern evincing racial bias (Claim H-15 in Petition) . . . . 132 |
|       | 18. | Failure to object adequately to the absence of meaningful appellate review (Claim H-16 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132 |
|       | 19. | The State's failure to appoint counsel with sufficient criminal and capital litigation experience denied petitioner his right to a fair trial (Claim H-17 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136 |
| C.    |     | Ineffective Assistance of Appellate Counsel (Claim I in Petition) . . . . . . . . . . 136 |
| D.    |     | Procedurally Defaulted Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141 |
|       | 1.  | False evidence presented by Robert Milstead (Claim C in Petition) . . . . 146 |
|       | 2.  | At the time of Boyd's trial, the trial judge was himself committing crimes (Claim D in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149 |
|       | 3.  | Verdict tainted by improper conduct of jurors (Claim E in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149 |
|       | 4.  | The prosecution withheld exculpatory evidence about Robert Milstead (Claim F in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150 |
|       | 5.  | Improper victim impact evidence (Claim G in Petition) . . . . . . . . . . . . 154 |
|       | 6.  | Alabama's capital compensation scheme compromised the performance of Boyd's attorneys (Claim H-1 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . 154 |
|       | 7.  | Boyd's trial attorneys were too inexperienced to try a capital case (Claim H-17 in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156 |
|       | 8.  | Aggravating circumstances inapplicable to Boyd (Claim L in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157 |
|       | 9.  | Trial court improperly overrode the jury's recommendation for sentence of life without parole (Claim M in Petition) . . . . . . . . . . . . . . . . . . . . . . . 159 |
|       | 10. | Refusal to find presence of nonstatutory mitigating circumstances (Claim N |

in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

11.   Lack of funding for expert assistance (Claim O in Petition) . . . . . . . . . . 160

12.   Deprivation of independent psychiatric assistance
      (Claim P in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

13.   Prosecution's racially discriminatory use of peremptory challenges (Claim Q
      in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

14.   Inadequate and improper jury instructions
      (Claim R in Petition). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

15.   Improper verdict forms (Claim S in Petition) . . . . . . . . . . . . . . . . . . . . 164

16.   Prosecutorial misconduct and improper arguments
      (Claim T in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

17.   Prejudicial presentence report (Claim U in Petition) . . . . . . . . . . . . . . . 165

18.   Incomplete transcript (Claim V in Petition) . . . . . . . . . . . . . . . . . . . . . . 166

19.   Double jeopardy / defective indictment (Claim X in Petition). . . . . . . . . 167

20.   Counsel's lack of sufficient time to make strategic decisions or properly
      represent the petitioner (Claim Z in Petition) . . . . . . . . . . . . . . . . . . . . 169

21.   State's failure to prove all elements of the offense
      (Claim AA in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

22.   Denial of impartial jury (Claim DD in Petition) . . . . . . . . . . . . . . . . . . 170

23.   Admission of Boyd's statements (Claim EE in Petition) . . . . . . . . . . . . 171

24.   Failure of Alabama death penalty statute to provide meaningful, comparative
      review (Claim HH in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

E.   Remaining Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

1.   Distinction between murder and capital murder
     (Claim J in Petition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

2.   Death by electrocution amounts to cruel and unusual punishment (Claim K

in Petition) ............................................... 176

3.    State's failure to prove all elements of the offense
(Claim AA in Petition) ..................................... 177

4.    Use of evidence illegally seized from Boyd's automobile (Claim GG in
Petition) ................................................ 180

V.    Conclusion. ........................................................ 190

## I. INTRODUCTION

This case is before the court on a petition for writ of habeas corpus brought by a person in custody under judgment of a court of the State of Alabama, filed pursuant to 28 U.S.C. § 2254. Petitioner, William Glenn Boyd, was convicted of capital murder in the Circuit Court of Calhoun County on March 20, 1987. By a vote of seven to five, the jury recommended that Boyd be sentenced to life in prison without the possibility of parole, but the trial judge subsequently rejected the jury's recommendation and, on April 9, 1987, sentenced petitioner to death.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Fred and Evelyn Blackmon disappeared from their home in Anniston, Alabama, on Wednesday, March 26, 1986. R 350-51; 354-56.[1] Sometime earlier that morning, prior to the couple's disappearance, Fred Blackmon, accompanied by a slender white male with long, dark hair, cashed a check for $5,000 at the drive–through window of an Anniston branch of the First Alabama Bank, where Mr. Blackmon maintained an account. R 386-88.[2] The Blackmons did not return home

---

[1] References to "**R**" are to pages in the record of the petitioner's 1987 trial proceedings.

[2] The Alabama Court of Criminal Appeals later described the events that occurred at the bank in the following manner:

Linda Jenkins, the operations officer at the Quintard branch of First Alabama Bank in Anniston, testified that she knew Fred Blackmon and saw him several times a week. She stated that on the morning of March 26, 1986, Mr. Blackmon drove up to the drive-in window. A slender, white male with long dark hair was with Mr. Blackmon in the car. Mr. Blackmon presented a check in the amount of $5,000. When Jenkins saw Mr. Blackmon, she spoke to him but he did not reply. Then

that night, and their black Cadillac Eldorado was missing. R 354-56; 379. When the

Blackmons had not returned home by Friday, two days after either last had been seen

or heard from, Evelyn Blackmon's daughter, Julie Greenwood, accompanied by her

father, Wayne Greenwood, filed a missing persons report with the Anniston Police

Department. R 356.

On the night of March 25, 1986, the evening before the Blackmons'

disappearance, Kenny Surrett, who had grown up with William Glen Boyd ("**Boyd**"

or "**petitioner**"), was with Boyd and his co-defendant, Robert Milstead. Surrett later

testified that he saw a chrome or silver .25 caliber automatic pistol and a .32 caliber

pistol in Boyd's possession. R 736-37.

Two nights later, after the Blackmons' disappearance, Surrett drove to Boyd's

house to collect on a bad check Boyd had given him. R 737-38. When Surrett

arrived, Boyd commented that he could not believe how "cold-blooded" he (Boyd)

was. R 739.

---

Jenkins said, "Fred, this is Linda. How are you doing?" R 387.) He just looked at her and nodded.

Jenkins approved the check and Mr. Blackmon received $5,000 in $100 bills. Jenkins stated that Mr. Blackmon's behavior was not normal that day.

Ellen Bass was the teller at the drive-in window that morning. Her testimony was substantially the same as Jenkins' testimony.

*Boyd v. State*, 542 So. 2d 1247, 1249 (Ala. Crim. App. 1988).

2

Then [Boyd] said he had something to tell Surrett. He said he and Milstead went to the Blackmons' house on the morning in question. [Boyd] took Mr. Blackmon to the bank and Mr. Blackmon got some money. Milstead and [Boyd] then took the Blackmons to the river. [Boyd] said Milstead hit Mrs. Blackmon in the nose and then shot her a couple of times. Later, the two broke Mrs. Blackmon's back and put her in a barrel which they pushed into the river.

[Boyd] said he hit Mr. Blackmon with a stick and then shot him. They put Mr. Blackmon's body into the trunk of his car and drove it into the river.

*Boyd v. State*, 542 So. 2d 1247, 1252-53 (Ala. Crim. App. 1988). Boyd paid Surrett

with money that, Boyd said, he had obtained from Mr. Blackmon. R 739. A week

later, Boyd joked with Surrett that the Blackmons might be "at the bottom of the

river." R 745.

At approximately 8:40 a.m. on March 26, 1986, the day of the Blackmons'

disappearance, Anniston Police Officer Ken Murphy was on routine patrol in the

Blackmons' neighborhood. He noticed a 1976 white, two-door, Chevrolet Camaro

illegally parked near the intersection of Sunset and Fairway Drives, just a quarter of

a mile or so from the Blackmon home. R 384-85. The license number on that vehicle

had been issued to Boyd. R 396-97.

Boyd was arrested for first degree kidnapping on April 3, 1986.[3] R 460-61;

523. After being advised of his *Miranda* rights, Boyd signed a waiver of rights form

_____

[3] Milstead was arrested before Boyd and gave a statement implicating Boyd.

3

and gave a confession. R 523-26. The Alabama Court of Criminal Appeals summarized the confession in its opinion on direct appeal, referring to Boyd as "appellant":

On the morning of March 26, 1986, the appellant and Robert Milstead went to the home of Fred and Evelyn Blackmon. The two had discussed getting money from the Blackmons. The appellant parked his 1976 white Camaro several blocks away from the Blackmons' house. Milstead went in the Blackmons' house first and held a gun on the Blackmons while the appellant came in the house. Both Milstead and the appellant had guns. One was a .25 caliber and the other was a .22 caliber gun. Mr. Blackmon agreed to get Milstead and this appellant money from his bank. Mr. Blackmon wrote out a check and the appellant accompanied him to the bank. A check in the amount of $5,000 was cashed at the bank and Mr. Blackmon gave the money to the appellant and they returned to [Mr.] Blackmon's house.

Once they got back to the house, the appellant and Mr. Blackmon, along with Milstead and Mrs. Blackmon, left the house in Mr. Blackmon's Cadillac Eldorado. Before leaving the house, the appellant took phones from the kitchen and upper bedroom because he knew the phones had been tapped.

Milstead drove the car and Mr. Blackmon sat in the front seat with Milstead. Mrs. Blackmon sat in the back seat with the appellant. They drove to Ohatchee and went down a dirt road to a spot on the river. The appellant said that they planned to tie the Blackmons up and leave them and he and Milstead were going to leave the state. Milstead took Mrs. Blackmon into the woods. When the appellant heard Mrs. Blackmon scream, he went into the woods. The appellant stated that Milstead hit Mrs. Blackmon from behind with a log and then he shot her. They left Mrs. Blackmon tied up there.

The two decided to knock Mr. Blackmon out and leave him. The appellant hit Mr. Blackmon on the head with a stick. Milstead then said

4

they had to kill him and Milstead shot Mr. Blackmon. Mr. Blackmon's body was then put in the trunk of his car.

Milstead and the appellant then drove Mr. Blackmon's car to a grocery store parking lot and left it there until after dark. The two went back and picked up the car and drove it back to the river. They then drove the car off a boat ramp into the river.

The next morning, Milstead purchased some 55-gallon barrels. The appellant and Milstead then went back to the place where they left Mrs. Blackmon. They put Mrs. Blackmon's body into one of the barrels along with rocks to weigh it down. They then rolled the barrel into the river.

[Boyd] stated that he and Milstead split the money in half. He said that the guns he and Milstead had were thrown in a creek in Ohatchee.

*Boyd*, 542 So. 2d at 1250-51.

Boyd gave a second statement to police on April 4, 1986, this time providing a better description of the locations of the crime scenes. R 542-47. Boyd gave yet a third statement on April 6, 1986, saying that he had remained in the automobile with Fred Blackmon while Milstead took Evelyn Blackmon into the woods. CR 50-51.[4] Boyd said that Milstead was just supposed to leave her there, but decided to kill her instead. *Id.* Boyd also said that Milstead later acquired a steel barrel from Home Depot, Mrs. Blackmon's body was placed in the barrel, and it then was rolled into the river, where it sank. *Id.* Boyd accompanied police to a creek on April 11, 1986, to

---

[4] References to "**CR**" are to pages in the Clerk's Record of Boyd's 1987 trial proceedings.

show where the guns had been discarded after the murders. R 547-50. A nickel-plated Raven Arms Company .25 caliber automatic pistol and a black .22 caliber pistol were recovered. R 620-21.[5] Only one, unfired round remained in the .25 caliber pistol, but there were five live rounds in the .22 pistol. R 621.

Following Boyd's arrest on April 3, 1986, Anniston Police Officers Robertson and Hall locked his automobile inside the Department's impoundment area. R 581, 610. Officers Watson and Bradley subsequently obtained keys to the vehicle and inventoried its contents on April 7, 1986. R 609. They found a piece of white and yellow cloth, knotted on one end, with hair entwined in the knot, a black mesh shirt, a pair of blue underwear, a black jacket, and another piece of cloth on the right front floorboard. R 613-14. They also found a roll of gauze and a gold necklace in the console. R 614. The necklace later was identified as belonging to Mrs. Blackmon. *Boyd*, 542 So. 2d at 1252. Two spent .22 caliber shell casings were found on the dashboard. R 615.

Robert Milstead accompanied police to the locations where each of the Blackmons had been separately killed following his arrest. R 591, 596-97, 767. At the scene of Mrs. Blackmon's murder, police found a trail through the woods. R 593-

---

[5] The court notes that there is a discrepancy in the caliber of these firearms: Sergeant Bryan Watson testified that he and his colleagues recovered a ".25 caliber automatic pistol" and a ".22 caliber six-shot revolver" from the creek, R 620; whereas, Kenny Surrett testified that he observed .25 and .32 caliber pistols in Boyd's possession. R 737.

6

94. Near the end of the trail, police found what appeared to be human hair entwined with white fibers. R 594. Approximately two feet from the hair, police found a large blood stain, about one foot across, that had soaked into the ground approximately three inches. R 596. A .25 caliber shell casing was found close to the blood stain. R 599. The hair found near the blood stain later was microscopically compared to a hair sample taken from Mrs. Blackmon's body and determined to be the same. R 717, 719, 722.

A metal drum containing Mrs. Blackmon's mutilated body was recovered from the Coosa River on April 9, 1986. R 616. Mrs. Blackmon's mouth had been gagged and a piece of cloth had been tied around her ankles. R 437. She sustained three gunshot wounds: a superficial wound to her head; a wound to the right side of her neck; and a wound to her back. R 437-39. None of the projectiles causing the wounds were found in her body. R 439. Mrs. Blackmon also sustained a laceration to her right forehead, numerous fractures to her nose and face, and a chop wound to her lower back that had severed the backbone. R 439-40. The gunshot wounds were determined to be the cause of death. R 439.

Mr. Blackmon's black, 1985 Cadillac Eldorado, with his body in the trunk, was recovered from the St. Clair County side of the Coosa River on April 4, 1986.[6] The

---

[6] The Coosa River is the western boundary separating Calhoun County from St. Clair County. R 588.

7

windows were down, the doors were unlocked, the ignition key was in the "on"

position, and the car was in first gear. After discovering that the car had a broken tail

light, the officers went to the area in Calhoun County at which Milstead said Mr.

Blackburn had been killed. At that scene, in the middle of a dirt road, the officers

found broken pieces of a red plastic tail light lens, a silver plastic Cadillac emblem,

two spent .25 caliber shell casings, and a long white fiber. R 602-09.

The state medical examiner who performed the autopsy upon Mr. Blackmon's

body found a torn strip of white cloth tied around his mouth as a gag. Mr. Blackmon

had been shot twice. One of the gunshots penetrated his neck and passed into his

chest cavity. The other penetrated the left side of his chest and passed through the

heart. Both bullets were recovered. Mr. Blackmon also had suffered a minor blunt

force injury to the back of his head. The gunshot wounds were determined to be the

cause of death. R 404-09.

The Calhoun County Grand Jury indicted Boyd on eight counts of capital

murder on April 25, 1986. The first four counts charged him with murder during the

course of a kidnapping, in violation of Alabama Code § 13A-5-40(a)(1) (1975), and

the remaining four counts charged him with murder during the course of a robbery,

in violation of § 13A-5-40(a)(2).[7]  CR 5-7; *Boyd*, 542 So. 2d at 1248-1249. All

---

[7] Ala. Code § 13A-5-40(a)(1) defines murder during a kidnapping in the first degree or an attempted kidnapping in the first degree as a capital offense, and § 13A-5-40(a)(2) states that murder

8

counts of the indictment are set forth in **Appendix I** to this opinion.

Boyd was arraigned on May 20, 1986, and entered pleas of not guilty by reason of mental disease or defect, and, not guilty. CR 25; R 35-49. He withdrew his plea of not guilty by reason of mental disease or defect on October 23, 1986. CR 26.

Boyd's trial began on March 16 of the following year. He was represented by Stephen B. Levinson, Grant A. Paris, and Mannon G. Bankston, Jr. The State called sixteen witnesses, including a medical examiner, a forensic pathologist, an evidence technician, a serologist, a firearms and toolmarks examiner, two bank employees, a commissioner of motor vehicle licences, several police officers, Mrs. Blackmon's daughter, Kenny Surrett, and Boyd's accomplice, Robert Milstead. *See Boyd*, 542 So. 2d at 1249-54. The testimony concerning the issues of whether Boyd had murdered Fred Blackmon, Evelyn Blackmon, or both victims conflicted. Anniston Police investigator Gary Carroll testified that Boyd made a statement about one week after the murders in which he insisted that his accomplice, Robert Milstead, had killed both victims. *Id.* at 1251. Kenny Surrett testified that Boyd confided to him that he shot Fred Blackmon. *Id.* at 1252-53. Milstead testified that Boyd killed both victims. *Id.* at 1253-54.

The jury returned verdicts on March 20, 1987, finding Boyd guilty on all eight

during a robbery in the first degree or an attempted robbery in the first degree also is a capital offense.

counts of the indictment. R 962-64. The penalty phase of the trial was conducted the

same day. The jury recommended, by a vote of seven-to-five, that Boyd be punished

by life imprisonment without the possibility of parole. R 1022.

Circuit Judge Harold R. Quattlebaum, who had presided over Boyd's trial,

commenced a sentencing hearing on April 9, 1987. CR 194-208. The State of

Alabama has created a trifurcated proceeding for the trial and sentencing of persons

charged with capital offenses. A jury initially sits in judgment of the guilt or

innocence of a defendant (the first, or "guilt-innocence phase" of trial). If the

defendant is determined to be guilty of a capital offense, the same jury also sits in the

initial phase of a bifurcated sentencing proceeding, at the conclusion of which the

jury issues an advisory sentencing verdict based upon its evaluation of aggravating

and mitigating circumstances (the second, or "penalty phase" of trial). *See* Ala. Code

§ 13A-5-46 (1975). The Eleventh Circuit summarized the second and third phases

of Alabama's capital-murder sentencing-framework in *Brownlee v. Haley*, 306 F.3d

1043 (11th Cir. 2002), saying:

> If the jury finds that no aggravating circumstances exist, or that any
> aggravating circumstances do not outweigh the mitigating
> circumstances, it must return an advisory verdict recommending life
> imprisonment without parole. *See* [Ala. Code] § 13A-5-46(e)(1)-(2). If,
> on the other hand, the jury finds one or more aggravating circumstances
> and determines that they outweigh the mitigating circumstances, it must
> recommend the death penalty. *See id*. § 13A-5-46(e)(3). Any verdict

10

recommending death must be based on a vote of at least ten jurors, while a recommendation of life imprisonment requires only a majority. *See id.* § 13A-5-46(f). If the jury can reach neither verdict, a mistrial is declared and another sentencing jury is empaneled. *See id.* § 13A-5-46(g).

After the jury has returned its advisory verdict at the sentencing [*i.e.*, "penalty"] phase, the trial judge orders and receives a presentence investigation report, hears further arguments, and may receive additional evidence concerning the aggravating and mitigating factors. Taking into account all of the evidence, including that introduced at trial and in the sentencing proceeding before the jury, the court must then enter written findings with regard to the aggravating and mitigating circumstances. *See id.* § 13A-5-47(d). Like the jury, the trial judge must determine whether any aggravating circumstances exist and, if so, whether those aggravating circumstances outweigh any mitigating circumstances that it may find. In reaching its ultimate decision, the trial court "shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived" by the defendant. *Id.* § 13A-5-47(e).

*Brownlee*, 306 F.3d at 1050.

At the conclusion of the sentencing hearing — the third, or "sentencing phase" of the trial process — Judge Quattlebaum proceeded to determine the sentence. He took into account the evidence presented during trial, a pre-sentence investigative report, the jury's advisory verdict, and arguments of counsel. He found the existence of two statutory aggravating circumstances: the murders occurred while Boyd was committing or attempting to commit robbery and kidnapping (*see* Ala. Code §13A-5-49(4)); and the offenses were especially heinous, atrocious, or cruel when compared

11

to other capital offenses (*id*. §13A-5-49(8)).[8] CR 200; R 1030-32. The judge found

only one statutory mitigating circumstance: Boyd was twenty years of age on the date

---

[8] On the date of Boyd's sentencing, Alabama's criminal code enumerated eight aggravating circumstances, as follows:

(1) The capital offense was committed by a person under sentence of imprisonment;

(2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person;

(3) The defendant knowingly created a great risk of death to many persons;

(4) *The capital offense was committed while the defendant was engaged or was an accomplice in the commission of*, or an attempt to commit, or flight after committing, or attempting to commit, rape, *robbery*, burglary or *kidnapping*;

(5) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(6) The capital offense was committed for pecuniary gain;

(7) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or

(8) *The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.*

Ala. Code § 13A-5-49 (1975) (emphasis added to aggravating circumstances found by trial judge). In addition, Alabama Code § 13A-5-50 provided that:

The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) [*i.e.*, "*the capital offense was committed while the defendant was engaged or was an accomplice in the commission of . . . robbery, . . . or kidnapping*"] shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40.

of the offenses (*see id.* §13A-5-51(7)).[9]  CR 202; R 1033.  In addition, however, the

judge took into account one, non-statutory, mitigating circumstance:  the fact that

Boyd, to some degree, had assisted police in locating the bodies of the victims and

the weapons used in the murders.[10]  CR 202.  He then found the aggravating

circumstances outweighed the mitigating circumstances, rejected the jury's advisory

---

[9] Alabama's criminal code enumerated seven, non-exclusive, mitigating circumstances on the date of Boyd's sentencing:

(1) The defendant has no significant history of prior criminal activity;

(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(3) The victim was a participant in the defendant's conduct or consented to it;

(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;

(5) The defendant acted under extreme duress or under the substantial domination of another person;

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and

(7) *The age of the defendant at the time of the crime.*

Ala. Code § 13A-5-51 (emphasis added to mitigating circumstance found by the trial judge).

[10] *See* Ala. Code § 13A-5-52, providing that:

In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

13

verdict, and sentenced Boyd to death. R 1036; CR 202-03. The trial judge's written

findings of fact and sentencing order are set out in **Appendix II** to this opinion.

Boyd appealed his conviction and sentence to the Alabama Court of Criminal

Appeals. He was represented by one of his trial attorneys, Stephen B. Levinson, and

another attorney appointed for the purposes of appeal, Michael L. Allsup.[11]  Tab P-

33.[12]  Three issues were raised on direct appeal:

> 1. the warrantless search of Boyd's impounded vehicle, on a date
> remote from his arrest, was unreasonable, and the evidence seized as a
> result of that search was inadmissible at trial, and not admissible on a
> theory of search incident to a lawful arrest;
>
> 2. the trial judge erred to reversal when, after instructing the jury,
> but during the course of their deliberations, jurors requested that the
> judge define the distinction between "Murder and Capital" [sic], but he
> refused to do so; and,
>
> 3. the Circuit Court of Calhoun County, Alabama, lacked
> jurisdiction to try Boyd for the murder of Evelyn Blackmon.

Tab P-33 at 5-7. The Alabama Court of Criminal Appeals rejected Boyd's arguments

on each of the foregoing issues, and affirmed his conviction and death sentence.

---

[11] The second attorney appointed to represent Boyd on direct appeal, Michael Allsup, was suspended from the practice of law during the appeal process, "because he failed to fulfill continuing legal education requirements of the Alabama State Bar"; consequently, Levinson prepared Boyd's appeal. *Boyd v. State*, 746 So. 2d 364, 403 (Ala. Crim. App. 1999).

[12] **"Tab P-___"** refers to documents in the record provided by respondent, as they are tabbed and indexed in the Respondent's Habeas Corpus Checklist (doc. no. 18). References to "Doc. ___" are to the docket number assigned a particular pleading by the clerk of this court, located in the lower right-hand-corner of documents in the case file.

With regard to Boyd's Fourth Amendment challenge to the warrantless search

of his automobile, the Court summarized the relevant facts as follows:

> On the afternoon of April 3, 1986, the appellant was arrested for
> kidnapping in the first degree as he drove up to and parked his
> automobile in front of his house at 701 Mulberry Street in Anniston,
> Alabama. The police took the appellant into custody and impounded his
> vehicle. The vehicle was taken to the Anniston Police Department's
> impound area. This area was fenced and locked. The vehicle's
> windows were up and the doors were locked.
>
> On the morning of April 7, 1986, Officers Watson and Bradley
> conducted an inventory search of the appellant's vehicle according to
> the standardized procedures of the Anniston Police Department. All of
> the contents of the vehicle were inventoried. During the course of the
> inventory, Watson and Bradley seized certain items which
> circumstantially linked this appellant to the Blackmons' deaths.

*Boyd v. State*, 542 So. 2d 1247, 1254-55 (Ala. Crim. App. 1988). The Court held on

the basis of these facts that police had conducted a lawful, warrantless "inventory

search" of Boyd's automobile.

> In *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49
> L. Ed. 2d 1000 (1976), the United States Supreme Court recognized an
> inventory search exception to the warrant requirement of the Fourth
> Amendment. *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L.
> Ed. 2d 739 (1987); *Ringer v. State*, 489 So. 2d 646 (Ala. Crim. App.),
> *cert. denied* 489 So. 2d 646 (Ala. 1986); *Lippold v. State*, 365 So. 2d
> 1015 (Ala. Crim. App. 1978), *cert. denied*, 365 So. 2d 1022 (Ala. 1979).
>
> In *Opperman*, the United States Supreme Court ruled that
> inventories of lawfully impounded vehicles which are conducted
> pursuant to standard police procedures are reasonable under the Fourth
> Amendment.

Here, both officers testified that the inventory search of the appellant's vehicle was conducted according to standard procedures of the Anniston Police Department.

*Boyd*, 542 So. 2d at 1255. The state court added that, under the United States

Supreme Court's holding in *Cooper v. California*, 386 U.S. 58, 87 S. Ct. 788, 17 L.

Ed. 2d 730 (1967), the fact that the officers conducted the inventory search some four

days after the vehicle's impoundment did not necessarily defeat the constitutionality

of the search.

During the four days between the appellant's vehicle's impoundment and the inventory of its contents, the Anniston Police Department was locating the various sites at which the events of this case took place. Officer Watson was involved in the collection of evidence found at these sites. Certainly, the discovery and preservation of evidence, found where each of the killings took place, were more important at the time than the inventory of the contents of the appellant's vehicle, which was properly secured.

*Boyd*, 542 So. 2d at 1255.

The Alabama Court of Criminal Appeals also rejected Boyd's argument that

police officers had acted in bad faith by conducting an unconstitutional search of his

automobile under the guise of preparing an "inventory" of its contents. *See id.* at

1255. The court relied on the decision in *Colorado v. Bertine*, 479 U.S. 367, 107 S.

Ct. 738, 93 L. Ed. 2d 739 (1987), which upheld an inventory search of a defendant's

impounded vehicle "where there was no showing that the police, who were following

16

standardized procedures, acted in bad faith or for the sole purpose of investigation."

*Boyd*, 542 So. 2d at 1255 (citation omitted). Likewise, in Boyd's case "there was no

showing that the officers acted in bad faith or conducted the inventory for

investigative purposes." *Id.* The court further observed, but only in passing, that

Boyd's accomplice had given the police "probable cause to believe that [Boyd's]

vehicle had been used in the commission of the crimes." *Id.*

Boyd also argued that he should have been tried in St. Clair County for Mrs.

Blackmon's murder, rather than Calhoun County. *Boyd*, 542 So. 2d at 1256. The

Alabama Court of Criminal Appeals disagreed, on the ground that the State had

charged Boyd with murder during the course of a robbery, and, murder during the

course of a kidnapping. *Id.* at 1256-57. Under these circumstances, Alabama Code

§ 15-2-6 applied: *i.e.*, "When an offense is committed partly in one county and partly

in another or the acts or effects thereof constituting or requisite to the consummation

of the offense occur in two or more counties, venue is in *either county*." Ala. Code

§ 15-2-6 (1975) (emphasis supplied). Thus, even if Boyd or his accomplice had

murdered Mrs. Blackmon in St. Clair County, the kidnapping and robbery

components of the capital murder offenses had been committed in Calhoun County,

making the latter a proper venue for trial. *Boyd*, 542 So. 2d at 1256-58.

The Alabama Court of Criminal Appeals also upheld the trial judge's decision

17

not to give additional instructions regarding the difference between "murder" and "capital murder" following the jury's request for clarification of the distinction. *Boyd*, 542 So. 2d at 1258-59. The state court initially observed that, as a procedural matter, Boyd had failed to preserve this issue for review by not objecting at trial. *Id.* at 1258.[13] Nevertheless, the court stated that it would affirm the trial judge's decision even if Boyd had properly preserved the issue for review. "We do not find the trial judge's refusal to give additional instructions to the jury on murder and capital murder to be error, since the trial judge thoroughly instructed the jury on these matters in his oral charge to them." *Id.* at 1259.

---

[13] In support of the finding that counsel had failed to preserve the error for review on appeal, the Alabama Court of Criminal Appeals relied on the following extract from the trial transcript:

THE COURT: Let the record reflect the jury is outside the courtroom. Counsel for the defendant and the state are present.

I have received a note from the jury which reads: "Could we have a distinction between murder and capital murder?" I have responded: "Murder and capital murder have already been defined to you. You should use your own recollection of those definitions to determine any distinction." What says the state?

Mr. FIELD: Satisfied, Your Honor.

THE COURT: What says the defendant?

Mr. PARIS: Satisfied, Your Honor.

THE COURT: I'll send the note back up.

*Boyd v. State*, 542 So. 2d 1247, 1258 (Ala. Crim. App. 1988) (citing R 961) (internal quotation marks omitted).

18

On a related procedural issue, the court also addressed the question of whether Boyd had failed to adhere to Rule 10(f) of the Alabama Rules of Appellate Procedure when moving to introduce new evidence regarding the issue of the trial judge's refusal to re-instruct the jury. *Boyd*, 542 So. 2d at 1258. Boyd had moved to extend the record on appeal and submitted copies of affidavits executed by two of his trial attorneys, Brian Stephen Levinson and Grant A. Paris. Levinson averred that, in fact, he *had* objected to the judge's refusal to reinstruct the jury; and Paris testified that the trial transcript incorrectly reflected that he had consented to the trial judge's decision. *Id.*[14] The Court of Criminal Appeals declined to consider these affidavits, on the ground that Boyd "ha[d] failed to make a proper motion to supplement the record under Rule 10(f), A.RA.P." *Id.*[15]

Finally, the Alabama Court of Criminal Appeals affirmed the trial judge's decision to sentence Boyd to death, concluding that "we have found no evidence in the record that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor." *Boyd*, 542 So. 2d at 1260. The Court independently re-weighed the aggravating and mitigating factors considered by the trial judge, a process which the court said "convinces us that death was the proper sentence to be

---

[14] *See supra* note 13.

[15] The court did not cite the precise language of the Rule, or explain how Boyd's motion and affidavits violated the state's rules of appellate procedure.

19

imposed in this case." *Id.* The court added that Boyd's sentence was not disproportionate to penalties imposed in similar cases, and that the court had "carefully searched this record for plain error and [we] have found none." *Id.*

Boyd petitioned the Supreme Court of Alabama for *certiorari* review, and argued that:

1. the Alabama Court of Criminal Appeals erred in holding that the warrantless search of Boyd's impounded vehicle was reasonable and not in violation of the Fourth Amendment;

2. the Court of Criminal Appeals misapprehended the law in holding that the trial judge's refusal to give additional instructions to the jury on the distinctions between murder and capital murder was not error; and,

3. the Court of Criminal Appeals mistakenly held that Boyd had failed to file a proper motion to supplement or extend the record on appeal in accordance with the state rules of appellate procedure.

*See* Tab P-37 at 3-4.

The Alabama Supreme Court affirmed the judgment of the Court of Criminal Appeals on February 24, 1989. The Court's opinion focused almost exclusively on Boyd's Fourth Amendment claim,[16] and rejected the Court of Criminal Appeals'

---

[16] In a footnote, the Alabama Supreme Court upheld the trial judge's decision not to reinstruct the jury on the difference between "murder" and "capital murder," and appeared to uphold the Court of Criminal Appeals' decision not to permit Boyd to supplement the record on the issue. The Court stated:

At the trial of this case, the trial court refused to redefine "murder" and "capital murder" for the jury upon the jury's request for that distinction after beginning deliberations. The record indicates that Boyd's counsel made no objection

20

rationale on that issue. The Alabama Supreme Court reasoned that inventory searches

were reasonable under the Fourth Amendment if performed for the purposes of: (1)

protecting the owner's property while his vehicle remained in police custody; (2)

protecting the police against claims or disputes over lost or stolen property; or (3)

protecting the police from potential danger. *Ex parte Boyd*, 542 So. 2d 1276, 1278

(Ala. 1989). These underlying justifications were "simply not served, however, when

the inventory is inexcusably postponed" for some four days between impoundment

and a putative "inventory" search. *Id.* at 1280. The Alabama Supreme Court added

that the state's district attorney had failed at trial to properly establish the Anniston

Police Department's procedures for conducting inventories of the contents of

impounded motor vehicles. *Id.* at 1281-82. The testifying police officers merely had

given "conclusory statements" that they followed "standard department procedures,"

without detailing just what those procedures were. *Id.* This failed to meet

constitutional standards, where "the record *must* sufficiently reflect *what* the

[inventory] *policy is*, describe the policy in such a way that its *reasonableness can be*

> to the court's action; Boyd's counsel adamantly insists otherwise. At a post-judgment hearing to correct or supplement the record, the trial court concluded that no objection was made. The Court of Criminal Appeals refused to consider the issue, but stated, in dicta, that the trial court committed no error. Assuming, without deciding, that the issue is properly before this Court, we find that the action of the trial court is not error inasmuch as the jury was fully instructed on the matters at issue.

*Ex parte Boyd*, 542 So. 2d 1276, 1284 n.9 (Ala. 1989).

*reviewed*, and present adequate evidence of *what the employed criteria were.*" *Id.* at 1283 (emphasis in original).

Nevertheless, the Alabama Supreme Court held that police had conducted a constitutional search of Boyd's automobile, because "the police had probable cause to believe that [Boyd's] vehicle had been used in the commission of the crimes." *Ex parte Boyd*, 542 So. 2d at 1284. Boyd had informed a lieutenant in the police department that the clothes he and his accomplice wore on the day of the crimes were in his automobile. The lieutenant subsequently instructed officers to conduct an inventory of the vehicle. *Id.* The Court therefore concluded that, "because the officers of the Anniston Police Department did in fact have probable cause to search Boyd's vehicle at the time it was impounded, and because that probable cause continued throughout the four days between the impoundment and the search, the warrant requirement of the Fourth Amendment was excused." *Id.* at 1285. The evidence obtained from Boyd's vehicle was thus admissible, "despite [the Court's] conclusion that the search can not be upheld as a valid inventory." *Id.* at 1286.

Boyd petitioned the United States Supreme Court to issue a writ of *certiorari*, presenting two questions for review:

> 1. Does the failure of the Alabama Supreme Court to apply its procedural default rules against the State of Alabama, thereby allowing the State to justify an illegal search for the first time on appeal with facts

22

and arguments not developed at trial, violate [Boyd's] rights to due process and a fair trial under the Fourth, Sixth, Eighth, and Fourteenth Amendments?

2. Does a warrantless search of an automobile that is not justified by both probable cause and exigent circumstances violate the Fourth Amendment?

Tab P-42. The Supreme Court denied *certiorari* on October 2, 1989. *Boyd v. Alabama*, 493 U.S. 883 (1989).

In July of 1990, the petitioner, represented by Ruth E. Friedman — the attorney who also is representing him in the present habeas proceeding — filed a petition for post-conviction relief pursuant to Rule 20 of the Alabama *Temporary* Rules of Criminal Procedure — renumbered Rule 32 in the permanent state rules of criminal procedure. For convenience, as well as consistency with subsequent precedent relying upon the permanent state rule, Boyd's state petition for post-conviction relief will be referred to in the remainder of this opinion as "**the Rule 32 petition**."

Boyd raised thirty-two issues in his Rule 32 petition, including claims that he received ineffective assistance of counsel at trial and on subsequent direct appeal. PCR Vol. 1 at 11-47;[17] Tab P-43. Harold R. Quattlebaum, the judge who had

---

[17] "**PCR**" refers to the state post-conviction record. The original record, filed on November 20, 1997, consisted of twenty volumes. Citations to this twenty-volume record will include a reference to the volume number (*e.g.*, PCR Vol.___ at ___). Two supplemental records also were filed: *i.e.*, a three-volume supplemental record was filed on January 9, 1998; and, a six volume supplemental record was filed on March 5, 1998. Citations to "**PCR Supp. Vol. ___ of 3**" refer to the three volume supplement, and "**PCR Supp. Vol.___ of 6**" refers to the six volume supplement.

presided over Boyd's trial and sentenced him to death, resigned his judicial position prior to the date Boyd filed his petition for collateral relief in the state system. Consequently, his replacement on the state bench, Joel R. Laird, Jr., presided over all proceedings connected with the Rule 32 petition.

Judge Laird summarily dismissed Boyd's petition on September 12, 1990. PCR Vol. 1 at 2. Boyd filed a motion for reconsideration on October 15, 1990. PCR Vol. 1 at 88. Before Judge Laird ruled on the motion for reconsideration, Boyd filed an amended Rule 32 petition, deleting several of the thirty-two issues originally raised, but adding others. PCR Vol. 1 at 94-133; Tab P-44. Judge Laird conducted a motion hearing on April 1, 1991, during which he stated his intention to set aside his earlier Order, summarily dismissing Boyd's original Rule 32 petition, but nevertheless permitting Boyd to "go forward on the ground[] of ineffective assistance of counsel only." PCR Vol. 16 at 11-27; Tab P-50.

Boyd filed a *second* amended Rule 32 petition on July 8, 1994, so that his petition now included a total of thirty-seven issues, with thirty-one sub-parts under his claim of ineffective assistance of counsel. PCR Vols. 2-3 at 387-430; Tab P-45. The State filed a Motion for Partial Dismissal of the *second* amended Rule 32 petition on August 8, 1994. PCR Vol. 3 at 439-44. Judge Laird entered an Order of Partial Dismissal on September 7, 1994, dismissing all of Boyd's claims except for his claim

24

of ineffective assistance of counsel. PCR Vol. 3 at 496-97. The Order of Partial

Dismissal was served on the parties on September 8, 1994, when the court began an

evidentiary hearing on Boyd's *second* amended petition. PCR Vol. 16 at 95. The

dismissal order was discussed during the September 8, 1994 hearing, as follows:

> MS. FRIEDMAN: Your Honor, if I could just state something before
> I call the first witness.
>
> Counsel and I have had an opportunity to read the order that was
> entered today and to discuss it with our client, and I just want to be sure
> I understand that the order is saying the only evidence we can put on at
> this hearing is that [which] pertains to the ineffective assistance of
> counsel claim, which means that the witnesses we discussed today . . .
> we would not be permitted to present that testimony?
>
> THE COURT: Correct.
>
> MS. FRIEDMAN: Your Honor, we just want to state for the record that
> the Court's ruling deprives Mr. Boyd of a full and fair hearing and his
> right to present all the claims and all the reasons why his capital
> conviction of sentence of death were obtained in violation of Alabama
> law and the United States Constitution.
>
> THE COURT: Well, the Court finds they are precluded. I have
> amended my order of yesterday. I amended it this morning, just adding
> another section under Rule 32 stating that the claims are dismissed
> pursuant to Rule 32.2(a) and Rule 32.7(b), which is the preclusion
> subsection.[18]

---

[18] The September 8, 1994 Amended Order of Partial Dismissal referred to in this portion of
the record reads as follows:

> This matter comes before the Court on the Petitioner's Rule 32 Petition for
> Relief from Judgment and Sentence as twice amended. The Court, prior to the
> Petitioner filing his Second Amended Rule 32 Petition, dismissed all of the

MS. FRIEDMAN: Okay. Your Honor, we would also state that to the extent that the Alabama Rules do preclude that, which we are not conceding, Mr. Boyd is still being deprived of his rights under the United States Constitution, and we will make a written response to this as soon as is practicable.

PCR Vol. 16 at 99-101. When the September 8, 1994 proceeding recessed, Judge Laird noted that, due to a death in his family and an upcoming criminal trial, he would attempt to conclude defendant's Rule 32 hearing as soon as possible. PCR Vol. 17 at 296.

On October 6, 1994, Boyd filed a "Motion to Reconsider the Denial of Petitioner's Motions for Discovery Orders Pertaining to Robert Milstead's Military Records and F.B.I. Investigation Records," PCR Vol. 3 at 503-07, and "Objections to the Court's Dismissal of Claims and Motion to Reconsider." PCR Vols. 3-4 at 508-729. Judge Laird denied both motions the same day. PCR Vol. 3 at 503, 508.

---

Petitioner's claims other than the Petitioner's claim of ineffective assistance of counsel, as being precluded under Rule 32.2(a) of the Alabama Rules of Criminal Procedure, said order being put on the record in open Court. The Petitioner has now filed a Second Amended Rule 32 Petition for Relief from Judgment and Sentence alleging grounds for relief other than ineffective assistance of counsel. The Court hereby finds all grounds for relief other than the claim of ineffective assistance of counsel to be precluded under Rule 32.2(a) of the Alabama Rules of Criminal Procedure and said claims should therefore be dismissed.

Therefore, it is hereby ORDERED, ADJUDGED AND DECREED that all claims other than the claim of ineffective assistance of counsel contained in the Petitioner's Rule 32 Petition are dismissed pursuant to Rule 32.2(a) and Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

PCR Vol. 3 at 498-99.

The evidentiary hearing reconvened on October 6, continued through October 7, then concluded on October 12, 1994. PCR Vols. 17-20 at 1-598; Tab P-52. The parties were instructed to submit briefs and proposed orders after receipt of the hearing transcript. PCR Vol. 20 at 594-97. On October 31, 1994, Boyd filed a "Motion to Reconsider Exclusion of Petitioner's Documentary Evidence," PCR Vol. 4 at 730-50, and a "Motion to Reconsider Admission of Testimony Regarding Rule 32 Claims Dismissed by the Trial Court and Proffer." PCR Vol. 4 at 751-58. Judge Laird denied both motions on November 14, 1994. PCR Vol. 4 at 759. The parties eventually submitted briefs in September 1996, nearly two years after the conclusion of the Rule 32 hearing, apparently without the aid of a transcript of the Rule 32 hearing.[19] *Boyd,* 746 So. 2d at 374.

Judge Laird denied Boyd's Rule 32 petition on July 25, 1997. The written order amounted to little more than a summary rejection of his claims:

This matter comes before the Court on the Petitioner's Petition as amended pursuant to Rule 20 (Temporary) Rules of Criminal Procedure (now Rule 32, Alabama Rules of Criminal Procedure). This Court has previously dismissed all claims asserted by the Petitioner except [for] Petitioner's claims of ineffective assistance of counsel. The Court has heard and considered extensive testimony concerning the issues of ineffective assistance of counsel in this case, has given the parties an opportunity to present written arguments and caselaw and has reviewed the file and transcript of the original trial in this case.

---

[19] It appears that the transcript of the hearing was not made available until October 30, 1997.

The Petitioner raises thirty (30) separate claims of ineffective assistance of counsel, both at the trial level and appellate level. Upon consideration of all of the above as it concerns and applies to each separate claim, this Court finds that the Petitioner has failed to show that his counsel's representation, both at the trial level and appellate level, fell below [an] objective standard of reasonableness or that there was a reasonable probability that but for counsel's unprofessional errors, if any, the outcome of his case would have been different, as required by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).

It is therefore, ORDERED, ADJUDGED, AND DECREED that the Petitioner's request for relief pursuant to Rule 20 (now Rule 32) of the Alabama Rules of Criminal Procedure is hereby DENIED.

PCR Vol. 5 at 944-45; Tab P-53.

Boyd filed a notice of appeal on September 4, 1997. PCR Vol. 5 at 946. The

Alabama Court of Criminal Appeals initially rendered an unpublished memorandum

opinion on December 18, 1998, affirming Judge Laird's denial of Boyd's Rule 32

petition. *Boyd v. State*, 744 So. 2d 954 (Ala. Crim. App. 1998). Following Boyd's

application for rehearing, the Court withdrew its unpublished memorandum opinion,

and entered a published opinion on March 26, 1999, again affirming the denial of

Boyd's Rule 32 petition. *Boyd v. State*, 746 So. 2d 364 (Ala. Crim. App. 1999).

Boyd petitioned the Supreme Court of Alabama for *certiorari* review, raising

the same claims he had raised before the Court of Criminal Appeals. Tab P-54. The

Court denied his petition on October 22, 1999, without opinion. The present petition

28

for writ of habeas corpus was filed in this court on October 16, 2000.

## III. THE CLAIMS PRESENTED FOR REVIEW

William Glenn Boyd raises the following claims in the petition filed pursuant

to 28 U.S.C. § 2254:

1.  Boyd received ineffective assistance of counsel in violation of rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because his trial counsel failed to adequately investigate and present mitigating evidence. (Claim A in Petition).

2.  Boyd's trial counsel was constitutionally ineffective at sentencing, for making no attempt to secure a sentence of life without parole from the trial court. (Claim B in Petition).

3.  The prosecution's key witness, Boyd's co-defendant Robert Milstead, presented evidence that the state knew or should have known was false. (Claim C in Petition).

4.  Boyd was tried and sentenced by a trial judge who, at the time, was himself committing crimes, and who, therefore, was dependent upon the good will of the prosecutor seeking a death sentence for petitioner. (Claim D in Petition).

5.  The guilty verdict was tainted by the improper conduct of members of the jury. (Claim E in Petition).

6.  The prosecution withheld exculpatory evidence about Boyd's co-defendant in violation of *Brady v. Maryland* and the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim F in Petition).

7.  The trial court considered the wishes of the victims' family before overriding the jury's verdict and sentencing Boyd to death. (Claim G in Petition).

8.  Boyd received ineffective assistance of counsel during the first (guilt/innocence) phase of his capital trial (Claim H in Petition):

29

a.   Alabama's capital compensation scheme compromised the performance of Boyd's attorneys. (Claim H-1 in Petition).

b.   Trial counsel failed to seek appropriate expert assistance for the pretrial, trial, and sentencing proceedings. (Claim H-2 in Petition).

c.   Trial counsel failed to preserve Boyd's right to be free from double jeopardy. (Claim H-3 in Petition).

d.   Trial counsel failed to object to the prosecutor's racially discriminatory use of peremptory challenges. (Claim H-4 in Petition).

e.   Trial counsel failed to adequately cross-examine and otherwise impeach the credibility of key state witnesses, including Robert Milstead, Kenny Surrett, and the state's forensic experts. (Claim H-5 in Petition).

f.   Trial counsel had no strategy for saving their client from a capital murder conviction. (Claim H-6 in Petition).

g.   Trial counsel failed to object to erroneous instructions given by the trial court at the guilt/innocence phase of the trial. (Claim H-7 in Petition).

h.   Trial counsel failed to object to prosecutorial misconduct. (Claim H-8 in Petition).

i.   Trial counsel failed to object to improper victim impact testimony. (Claim H-9 in Petition).

j.   Trial counsel failed to secure a transcription of critical portions of the proceedings. (Claim H-10 in Petition).

k.   Trial counsel failed to properly object to the use of electrocution in Alabama as cruel and unusual punishment. (Claim H-11 in Petition).

l.   Trial counsel failed to object to excessive security measures in the courtroom that were prejudicial to their client. (Claim H-12 in Petition)

m.  Trial counsel failed to prepare adequately for pretrial hearings. (Claim H-13 in Petition).

n.  Trial counsel allowed improper and prejudicial evidence to be admitted. (Claim H-14 in Petition).

o.  Trial counsel failed to properly object to the imposition of the death penalty in this case pursuant to a pattern evincing racial bias. (Claim H-15 in Petition)

p.  Trial counsel failed to object adequately to the absence of meaningful appellate review. (Claim H-16 in Petition).

q.  The failure of the State of Alabama to provide Boyd with counsel with sufficient criminal and capital litigation experience denied petitioner his right to a fair trial. (Claim H-17 in Petition).

9.  Boyd received ineffective assistance of counsel on appeal to the Alabama Court of Criminal Appeals and the Supreme Court of Alabama. (Claim I in Petition).

10. The failure of the trial court to define the distinction between murder and capital murder when the jury sought an explanation during deliberations deprived Boyd of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Claim J in Petition).

11. Electrocution as a means of execution is cruel and unusual punishment. (Claim K in Petition).

12. Boyd's death sentence rests on aggravating circumstances that are inapplicable to his case in violation of the Sixth, Eighth, and Fourteenth Amendments. (Claim L in Petition).

13. It was improper for the trial court to sentence Boyd to death after the jury recommended a sentence of life without parole. (Claim M in Petition).

14. The trial court erred in refusing to find the presence of non-statutory mitigating

31

circumstances based on the evidence before it. (Claim N in Petition).

15. Boyd was deprived of due process, equal protection, a fair trial, and fair sentencing by the trial court's refusal to provide funds for expert assistance. (Claim O in Petition).

16. Boyd was denied independent psychiatric assistance; instead, he was transported against his will to the State's Taylor-Hardin Secure Medical Facility in Tuscaloosa, Alabama, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim P in Petition).

17. Boyd was deprived of a fair trial by an impartial jury due to the prosecutor's racially discriminatory use of peremptory challenges. (Claim Q in Petition).

18. The trial court's jury instructions during the first (guilt/innocence) phase of the trial were inadequate and improper. (Claim R in Petition).

19. The verdict forms failed to provide the jury an opportunity to convict Boyd of some charges while acquitting him of others. (Claim S in Petition).

20. The prosecutor's misconduct and improper arguments prior to and during the guilt/innocence phase of the trial and at the sentencing hearing deprived Boyd of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Claim T in Petition).

21. The trial court considered a prejudicial presentence report before rejecting the jury's verdict and sentencing Boyd to death. (Claim U in Petition).

22. The trial court failed to provide Boyd with a full transcript of the proceedings that resulted in his capital conviction and death sentence. (Claim V in Petition).

23. The grand and petit jury pools were not representative of the community. (Claim W in Petition).

24. The indictment, conviction, and sentencing of Boyd on eight separate counts of capital murder for the murder of two individuals violated his rights under

32

the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim X in Petition).

25. The trial court erred in not changing the venue of the trial due to extensive pretrial publicity. (Claim Y in Petition).

26. The trial court failed to grant defense counsel sufficient time to make strategic decisions or properly represent their client. (Claim Z in Petition).

27. The state failed to meet its burden of proving all elements of the offense. (Claim AA in Petition).

28. Boyd's death sentence is unconstitutional because it was sought and imposed pursuant to a pattern of racial bias in the imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim BB in Petition).

29. Boyd's rights to a fair trial and impartial jury were violated by the trial court's failure to permit individually sequestered voir dire of prospective jurors. (Claim CC in Petition).

30. Boyd was deprived of an impartial jury by the failure of the trial court to grant his challenges for cause during jury selection in violation of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim DD in Petition).

31. The admission into evidence of Boyd's statements violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim EE in Petition).

32. The security measures present in the courtroom during Boyd's trial were excessive and prejudicial in violation of Boyd's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim FF in Petition).

33. Evidence illegally seized from Boyd's automobile was used against him in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Claim GG in Petition).

34. The Alabama death penalty statute is unconstitutional because it fails to

provide meaningful, comparative review for those under a sentence of death. (Claim HH in Petition).

In response, the State of Alabama contends that all of Boyd's claims are procedurally barred, or have been previously adjudicated on the merits in state judicial proceedings, or that each is without merit.

## IV. DISCUSSION

President Clinton signed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") on April 24, 1996. Boyd's habeas petition was filed after that date. Therefore, the provisions of 28 U.S.C. § 2254 as amended by AEDPA, rather than the pre-1996 version of the habeas statute, apply to his claims in this court.[20]

In addition to other substantive changes worked by AEDPA in the law applicable to § 2254 habeas proceedings, the Act heightens the degree of deference federal courts must accord a state court's factual determinations.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. *The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.*

28 U.S.C. § 2254(e)(1) (emphasis supplied).

---

[20] *See, e.g., Williams v. Taylor*, 529 U.S. 362, 402, 120 S. Ct. 1495, 1518 (2000) ("Williams' case is *not* governed by the pre-1996 version of the habeas statute. Because he filed his petition in December 1997, Williams' case is governed by the statute as amended by AEDPA.") (O'Connor, J., speaking for a majority with respect to Part II of the Court's opinion) (emphasis in original).

34

Further, § 2254(d), as amended by AEDPA, provides that:

An application for a writ of habeas corpus on behalf of a person
in custody pursuant to the judgment of a State court shall not be granted
with respect to any claim that was adjudicated on the merits in State
court proceedings *unless the adjudication of the claim—*

(1) resulted in a decision that was *contrary to*, or involved *an
unreasonable application* of, clearly established Federal law, *as
determined by the Supreme Court of the United States*; or

(2) resulted in a decision that was based on *an unreasonable
determination of the facts* in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).  The Supreme Court first construed the

language of § 2254(d)(1) as amended by AEDPA in *Williams v. Taylor*, 529 U.S. 362,

120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), where, in speaking for a majority as to the

proper construction of the amended provision (Part II of the Court's decision), Justice

O'Connor wrote:

Section 2254(d)(1) defines two categories of cases in which a state
prisoner may obtain federal habeas relief with respect to a claim
adjudicated on the merits in state court. Under the statute, a federal
court may grant a writ of habeas corpus if the relevant state-court
decision was either (1) "*contrary to* . . . clearly established Federal law,
as determined by the Supreme Court of the United States," or (2)
"*involved an unreasonable application of* . . . clearly established Federal
law, as determined by the Supreme Court of the United States."
(Emphases added.)

*Id.* at 404-05, 120 S. Ct. at 1519 (O'Connor, J., majority opinion as to Part II of

decision) (emphasis in original).

The parameters of § 2254(d)(1)'s "contrary to" clause were defined as follows:

[A] state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. *See* 143 F.3d, at 869-870.

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different." *Id.*, at 694, 104 S. Ct. 2052. A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be

36

unconstrained by § 2254(d)(1) because the state-court decision falls
within that provision's "contrary to" clause.

*Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1519-20 (O'Connor, J.).

In contrast, Justice O'Connor sketched the parameters of § 2254(d)(1)'s

"unreasonable application" clause only with broad strokes:

> A state-court decision that correctly identifies the governing legal
> rule but applies it unreasonably to the facts of a particular prisoner's
> case certainly would qualify as a decision "involv[ing] an unreasonable
> application of . . . clearly established Federal law." . . .
>
> . . . .
>
> Stated simply, a federal habeas court making the "unreasonable
> application" inquiry should ask whether the state court's application of
> clearly established federal law was objectively unreasonable. . . .
>
> The term "unreasonable" is no doubt difficult to define. That
> said, it is a common term in the legal world and, accordingly, federal
> judges are familiar with its meaning. For purposes of today's opinion,
> the most important point is that an *unreasonable* application of federal
> law is different from an *incorrect* application of federal law. . . . Under
> § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas
> court may not issue the writ simply because that court concludes in its
> independent judgment that the relevant state-court decision applied
> clearly established federal law erroneously or incorrectly. Rather, that
> application must also be unreasonable.

*Id.* at 407-11, 120 S. Ct. at 1520-22 (O'Connor, J.) (alteration and emphasis in

original).[21]

---

[21] Justice O'Connor summarized the majority's construction of § 2254(d)(1), as amended by
AEDPA, in the following manner:

The *Williams* formulation of the meaning of § 2254(d)(1), as amended by

AEDPA, was summarized in *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed.

2d 914 (2002), where the Court wrote:

> As we stated in *Williams*, § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U.S. at 404-405, 120 S. Ct. [at] 1495. A federal habeas court may issue the writ under the "contrary to" clause *if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. Id.* at 405-406, 120 S. Ct. 1495. The court may grant relief under the "unreasonable application" clause *if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. Id.*, at 407-408, 120 S. Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is *objectively unreasonable*, and we stressed in *Williams* that *an unreasonable application is different from an incorrect one. Id.*, at 409-410, 120 S. Ct. 1495. *See also id.*, at 411, 120 S. Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. at 412-13, 120 S. Ct. at 1523.

clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell*, 535 U.S. at 694-95, 122 S. Ct. at 1850 (emphasis supplied).[22]

## A.   Abandoned Claims

Although petitioner raised the following claims in his habeas petition, his principal brief states that, "given the status of the law at this time, [William Glen Boyd] no longer asserts that [any of the following are claims] to which he can establish the right to habeas corpus relief." Doc. 27 at 158. Accordingly, all of the following claims are deemed abandoned.

- a.    Failure to object to excessive security measures in the courtroom that were prejudicial to Boyd amounted to ineffective assistance of counsel (Claim H-12 in Petition).

- b.    Failure to object properly to the imposition of the death penalty in this

---

[22] The Eleventh Circuit elaborated the general significance of § 2254(d)(1)'s "contrary to" and "unreasonable application" standards in *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002), saying that:

Section 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by requiring satisfaction of one of two conditions for issuance of the writ. As the Supreme Court recently put it, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 1849, 152 L. Ed. 2d 914 (2002) (citing *Williams*, 529 U.S. at 403- 04, 120 S. Ct. 1495, 146 L. Ed. 2d 389).

*Robinson*, 300 F.3d at 1342-43.

39

case pursuant to a pattern evincing racial bias (Claim H-15 in Petition).

c.      The grand and traverse jury pools were not representative of the community (Claim W in Petition).

d.      The trial court erred in not changing the venue of the trial due to extensive pretrial publicity (Claim Y in Petition).

e.      Boyd's death sentence is unconstitutional because it was sought and imposed pursuant to a pattern of racial bias in the imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments (Claim BB in Petition).

f.      Boyd's rights to a fair trial and impartial jury were violated by the trial court's failure to permit individually sequestered voir dire of prospective jurors (Claim CC in Petition).

g.      Security measures present in the courtroom during Boyd's trial were excessive and prejudicial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments (Claim FF in Petition).

## B.      Ineffective Assistance of Trial Counsel Claims

The Eleventh Circuit recently summarized the standard to be applied when

determining whether a habeas petitioner received ineffective assistance of counsel in

*Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), saying:

The familiar legal standards applicable to such claims derive from the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Williams* [*v. Taylor*,] 529 U.S. [362,] 390-91, 120 S. Ct. [1495,] 1511-12[, 146 L. Ed. 2d 389 (2000)] (concluding that *Strickland* provided standards that were clearly established federal law applicable to ineffective assistance of counsel claims). In *Fugate* [*v. Head*, 261 F.3d 1206 (11th Cir. 2001)], we summarized these well-worn standards as follows:

40

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show (1) that "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 687, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674, and (2) that "the deficient performance prejudiced the defense," *id*. at 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674. In a capital case, the two-prong *Strickland* analysis is applied at both the guilt and penalty phases. *Mincey v. Head*, 206 F.3d 1106, 1142 (11th Cir. 2000) (quoting *Strickland*, 466 U.S. at 686-87, 104 S. Ct. 2052, 80 L. Ed. 2d 674).

Counsel's performance is entitled to "highly deferential" judicial scrutiny, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). This presumption is even stronger when the reviewing court is examining the performance of an experienced trial counsel. *See Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (*en banc*), *cert. denied*, 531 U.S. 1204, 121 S. Ct. 1217, 149 L. Ed. 2d 129 (2001).

In this case, the state habeas court acknowledged that ineffective assistance of counsel claims are governed by *Strickland* and that the petitioner was required to show both ineffectiveness and prejudice. To analyze the prejudice prong, a court must "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (citing *Clemons v. Mississippi,* 494 U.S. 738, 751-52, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990)).

"Given the strong presumption in favor of competence, the

41

petitioner's burden of persuasion — though the presumption is not insurmountable — is a heavy one." *Chandler*, 218 F.3d at 1314 (footnote and citations omitted). In order to show that counsel's performance was unreasonable, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." *Id*. at 1315 (footnote and citation omitted).

"No absolute rules dictate what is reasonable performance for lawyers." *Id*. at 1317 (citing *Strickland*, 466 U.S. at 688-89, 104 S. Ct. 2052, 80 L. Ed. 2d 674). Thus, courts refrain from establishing rigid requirements for trial counsel's performance. For example, there is no absolute duty to investigate particular facts or a certain line of defense, although a complete failure to investigate may constitute deficient performance of counsel in certain circumstances. *See id.*; *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) ("A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history.").

Likewise, "[n]o absolute duty exists to introduce mitigating or character evidence." *Chandler*, 218 F.3d at 1319. This court and the Supreme Court have held repeatedly that the performance of counsel who fails to present any mitigating evidence whatsoever — even when such evidence was available — may nonetheless pass constitutional muster. *See id.* (citing *Burger v. Kemp*, 483 U.S. 776, 794-96, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987); *Darden v. Wainwright*, 477 U.S. 168, 182-84, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc* )).

*Fugate*, 261 F.3d at 1216-17.

*Strickland* also spoke to the issue of how to review the adequacy of an attorney's investigation of issues related to a case, as well as to an attorney's strategic decisions not to pursue particular issues, stating:

42

>       These standards require no special amplification in order
> to define counsel's duty to investigate, the duty at issue in this
> case. As the Court of Appeals concluded, strategic choices made
> after thorough investigation of law and facts relevant to plausible
> options are virtually unchallengeable; and strategic choices made
> after less than complete investigation are reasonable precisely to
> the extent that reasonable professional judgments support the
> limitations on investigation. In other words, counsel has a duty
> to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate must
> be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.
> [*Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.]

*Crawford*, 311 F.3d at 1296-98.

### 1.    Failure to investigate and present mitigating evidence to the jury during the penalty phase of trial (Claim A in Petition)

Boyd claims that his trial attorneys deprived him of constitutionally effective

assistance of counsel by failing to conduct an investigation of his background and

character prior to trial, as a consequence of which they failed to present relevant and

compelling mitigating evidence during the penalty phase proceedings before the jury.

Boyd also takes issue with the state trial and appellate courts' decisions to deny him

relief on this claim in post-conviction proceedings, and argues that the state courts'

decisions were both contrary to, and involved an unreasonable application of, clearly

established federal law as determined by the Supreme Court of the United States.

As discussed earlier, the *Strickland* decision established the appropriate

43

standard for evaluating the effectiveness of counsel.  Therefore, this court may grant

Boyd relief only if the state courts' decisions reveal either an unreasonable

application of the *Strickland* standard, or decisions contrary to decisions of the United

States Supreme Court based upon facts that are materially indistinguishable from

Boyd's case.

### a.    Was the performance of Boyd's attorneys objectively deficient?

The Alabama Court of Criminal Appeals correctly identified the

constitutionally mandated performance requirement necessary to determine whether

Boyd's trial attorneys were objectively deficient for failing to investigate, develop,

and present mitigating evidence to the jury during the second, or penalty phase of

trial.  For example,

> To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
>
> The appellant must show that his counsel's performance was unreasonable, considering all of the attendant circumstances . . . . "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

*Boyd v. State*, 746 So. 2d 364, 376-77 (Ala. Crim. App. 1999) (quoting *Duren v.*

44

*State*, 590 So. 2d 360, 362 (Ala. Crim. App.1990), *aff'd*, 590 So. 2d 369 (Ala. 1991))

(internal quotation marks omitted).[23]

Thus, the state appellate court identified the correct legal rule, and did not

apply a standard that contradicts the governing law set forth in Supreme Court

precedent. *See Williams*, 529 U. S. at 406, 120 S. Ct. at 1519-20 (observing that a

state court decision correctly applying the *Strickland* standard to an ineffective

assistance of counsel claim "would not fit comfortably within § 2254(d)(1)'s

'contrary to' clause," even if "the federal court considering the prisoner's habeas

application might reach a different result applying the *Strickland* framework itself")

---

[23] When addressing the specific claim discussed in this part of the opinion, the Alabama Court of Criminal Appeals reiterated the statement of principles governing an attorney's duty to conduct an investigation into mitigating evidence that was expressed by the Eleventh Circuit in *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988): *i.e.*,

> An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986). First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. *Funchess v. Wainwright*, 772 F.2d 683, 689-90 (11th Cir. 1985). If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.

*Boyd v. State*, 746 So. 2d 364, 376-77 (Ala. Crim. App. 1999) (quoting *Daniels v. State*, 650 So. 2d 544, 569 (Ala. Crim. App. 1994) (in turn quoting *Middleton*, 849 F.2d at 493)) (internal quotation marks omitted).

45

(O'Connor, J., writing for a majority as to Part II of the Court's opinion); *Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002) (same).

Boyd nevertheless contends that, even though the Alabama Court of Criminal Appeals correctly identified the controlling legal standard, that court's decision still is "contrary to" clearly established federal law, in the sense that the state court confronted a set of facts that were materially indistinguishable from a relevant decision of the United States Supreme Court, but arrived at a result different from the Supreme Court's precedent. *See Williams*, 529 U. S. at 406, 120 S. Ct. at 1519-20 ("A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.") (O'Connor, J., speaking for a majority as to Part II of the Court's opinion). Alternatively, and for the same reasons, Boyd contends that the decision of the Alabama Court of Criminal Appeals constitutes an objectively "unreasonable application" of clearly established federal law.

The facts of Boyd's case applicable to this claim show that, even though defense counsel presented four mitigation witnesses during the penalty phase of trial,[24] there had been *no* prior inquiry into potential mitigation evidence with Boyd

---

[24] Although the Alabama Court of Criminal Appeals alluded to the "record on direct appeal" when mentioning, in its opinion from the denial of Boyd's Rule 32 petition, that Cindy Pierce

46

himself or any members of his family, other than for: an unspecified amount of time

spent by counsel with Boyd's sister, Ms. Cindy Pierce, prior to trial; and, a hurried

conversation with Ms. Pierce between the guilt and penalty phases of trial, during

which counsel instructed her to read a short summary of her brother's life to the jury,

in an effort to "humanize" Boyd.[25] Attorney Stephen Levinson, Boyd's lead defense

counsel, testified as follows during the Rule 32 hearing:

**Petitioner's Counsel:** *Did you speak with him* [Boyd] *about any family*

---

(Boyd's sister), Geraldine Oliver (Boyd's mother), Herbert Hicks (Boyd's pastor), and Boyd himself testified during the penalty phase, the court did not identify or address the substance of testimony elicited from any of those witnesses. *See Boyd*, 746 So.2d at 367-77. A review of the record on direct appeal also fails to identify or address the substance of any testimony presented at the penalty phase of trial, but only reveals that the appellate court found (without further elucidation) that the record supported the trial court's decision to consider "evidence concerning Boyd's background and character as mitigating circumstances." *Boyd v. State*, 542 So. 2d 1247, 1260 (Ala. Crim. App. 1988) (opinion on direct appeal from conviction).

[25] Boyd insists that his trial attorneys' sole effort to obtain mitigating evidence was to ask his sister to write down some facts about him, without any guidance, and then to have her read what she had written to the jury. He claims that the only other contacts by trial counsel with members of his family consisted of little more than informing them of court proceedings, and that no attempts were made to gather records, to talk to members of the community or extended family, or to obtain information from anyone about the circumstances of Boyd's upbringing and family life. *See* doc. no. 27, at 11. Boyd argues that, if counsel had interviewed family members, they would have learned of his history of abuse and neglect. *Id.* at 12-14. In addition to witness accounts, Boyd argues that his attorneys should have obtained numerous public documents that would have demonstrated the circumstances of his upbringing, such as: records from the Department of Human Resources (which would have shown that his mother often was neglectful, and lacked the psychological and financial resources to care for her children); hospital records (which would have shown the alcoholism of his father and grandparents, and his mother's chronic depression); school records (which would have established his learning disabilities and numerous absences); criminal records (which would have shown that his father often was incarcerated); and records documenting the mental problems of his younger sister, as well as a similar lack of parental response to her mental problems. *Id.* at 15-16. Boyd maintains that none of this evidence was presented because it simply was not investigated and gathered. In other words, there was no "strategy" against using this evidence, because his counsel never learned of its existence.

47

*members or neighbors —*

**Mr. Levinson:** *No. We spoke with Ms. Pierce* [Boyd's sister] —

**Petitioner's Counsel**: Who put Cindy Pierce on the stand? When did you make the decision to do that?

**Mr. Levinson:** Well, there was an assumption that if there was a conviction, *we would try to mitigate the effect of the conviction through a family member's testimony*; humanize the defendant, so to speak.

**Petitioner's Counsel:** How much time did you have to prepare Ms. Pierce for her testimony?

**Mr. Levinson:** Well, we had discussed Cindy's testimony prior to the trial even starting, but after the jury came back and convicted Glenn, we were given less than an hour in which to prepare, but there had been some prior time spent with Cindy relative to her testimony by me.

**Petitioner's Counsel:** *Did you speak to any of the family members about the possibility of neglect or deprivation?*

**Mr. Levinson:** *I don't think so.*

**Petitioner's Counsel:** Did you speak to anyone about the probable effect on Mr. Boyd of his sister leaving home?

**Mr. Levinson:** *No.*

PCR Vol. 16 at 131-33 (emphasis supplied); Tab P-51.

In stark contrast, the mitigation evidence that could have been discovered prior to trial and presented to the jury, but which was not tendered until the Rule 32 hearing, was described by the Alabama Court of Criminal Appeals in the following

48

manner:

> At the Rule 32 hearing, Boyd presented a wealth of testimony characterizing his childhood as consisting of continual gross poverty; gross physical and emotional abuse; gross neglect; and various humiliations. These indignities were bestowed at the hands of a cruel and alcoholic father and stepfather; a mentally disturbed mother; and loving but severely alcoholic grandparents.
>
> In addition to testimony from family and friends confirming Boyd's terrible childhood, Boyd's mitigation argument relies heavily on what experts would have said during the penalty phase of the trial had they been called as witnesses.[26]
>
> At the Rule 32 hearing, Boyd called Jan Vogelsang, a clinical social worker with extensive expertise in victimization and trauma. She testified that in preparing a psychosocial assessment on Boyd, she determined that Boyd came from "one of the worst family situations [she] ha[d] seen in terms of violence and neglect, alcoholism. It certainly rank[ed] up there in the top three or four worst cases."

---

[26] In a footnote to this portion of the quoted opinion, the Alabama Court of Criminal Appeals stated:

> This characterization of his horrible childhood was presented at the Rule 32 hearing by the following witnesses, whom Boyd asserts trial counsel should have called as witness at the sentencing phase of his trial: Jan Vogelsang, a licensed social worker and psychotherapist; Cindy Pierce, his sister (she also testified at [the] sentencing phase); Bill Whatley, a retired Anniston police officer who had investigated domestic disputes at Boyd's childhood home; Roy C. Snead, Jr., Sheriff of Calhoun County, who was familiar with William Hardy Boyd Jr.'s (Boyd's father['s]) arrest record and alcoholism; Kathy Gurley, who would have testified to the circumstances surrounding Boyd's childhood; Charles Pierce, Jr., Boyd's brother-in-law, who would have testified to the circumstances surrounding Boyd's childhood; Joseph Burton, a forensic pathologist from Georgia who reviewed material in Boyd's case; Carl Majeskey, a consultant for lawyers and insurance companies in the field of firearms; and Louis Mulray Tetlow, a licensed clinical psychologist. Boyd also presented records from the Department of Human Resources, hospitals, and courts to support the oral testimony.

*Boyd v. State*, 746 So. 2d at 377 n.5.

49

(Vol.17, R. 292-93.)  However, when asked if Boyd made a choice to participate in the murders, Vogelsang testified that, "[Boyd] made a choice to go there, and once he was there, obviously things got out of control.  Everyone has choices, but sometimes they make bad decisions and make bad choices, and in this case he certainly did that." (Vol. 17, R. page 279.)

Louis Mulray Tetlow, a licensed clinical psychologist, testified that Boyd "really does not have a major mental disorder." (Vol.19, R. 446.)  He stated that Boyd was not good at looking ahead to the consequences of his behavior. (Vol.19, R. 450.)  Tetlow stated that the murders in this case were not completely the result of Boyd's upbringing and that he did have some control over his actions in the situation. (Vol.20, R. 471.)

Karl Kirkland, the State's expert psychologist, testified that he agreed with Vogelsang's assessment that Boyd "clearly experienced abuse as he grew up." (Vol.20, R. 532.)  However, Kirkland also testified that in his opinion, Boyd's having grown up in a terribly dysfunctional home did not cause him to murder Fred Blackmon and Evelyn Blackmon. (Vol.20, R. 526.)  According to Kirkland, the murders were not the result of Boyd's having been subjected to parental alcohol abuse, physical abuse, poor parenting, poverty, or any combination of any of these events in his childhood.  It was Kirkland's conclusion that the murders were the result of an "individual making bad choices." (Vol.20, R. 535.)

*Boyd v. State*, 746 So. 2d at 377 (bracketed alterations in original) (footnote omitted).

In other words, the Alabama Court of Criminal Appeals acknowledged that

trial counsel failed to investigate, organize, and present "a wealth of testimony"

suggesting that Boyd's character had been shaped by a "childhood . . . consisting of

continual gross poverty; gross physical and emotional abuse; gross neglect; and

various humiliations"; and, and that all of these "indignities were bestowed at the hands of a cruel and alcoholic father and stepfather; a mentally disturbed mother; and loving but severely alcoholic grandparents." Further, "a clinical social worker with extensive expertise in victimization and trauma" characterized that background as "one of the worst family situations [she] ha[d] seen in terms of violence and neglect, alcoholism. It certainly rank[ed] up there in the top three or four worst cases." *Boyd v. State*, 746 So. 2d at 377 (bracketed alterations in original).

Despite these unrefuted facts, the state appellate court characterized the paltry proof of mitigating circumstances presented during the penalty phase of Boyd's trial as the product of a "defense strategy," and declined to "second-guess[]" the "tactical choices" of trial counsel. *Id*. at 379. In reaching that conclusion, the Alabama Court of Criminal Appeals ignored clear and convincing evidence establishing that defense counsel did *not* devise a professionally-competent, mitigation "strategy" prior to trial, *nor* did they make an informed "tactical choice" to present the penalty-phase case in the manner it was put before the jury.

The concept of a "tactical choice" presumes three facts not supported by the evidence in this case: (1) that trial counsel had conducted a professionally-competent investigation into the defendant's past life, searching for events or circumstances that might either explain the offense conduct or mitigate punishment for that conduct; (2)

51

as a result of that investigation, counsel had become privy to a body of mitigation

information relevant to the defendant's character and background that could be

presented during the penalty phase of trial as a basis for a sentence of life imprison-

ment without parole instead of death; and (3) applying prior trial experience and

professional judgment, counsel *consciously* made a *reasoned decision* to present all,

some, or none of the information known to counsel. No such "tactical choice" was

made in this case, because counsel undisputedly made no effort, much less a

reasonably competent effort, to ascertain Boyd's background prior to trial. As a

result, counsel possessed no information from which they could devise a penalty

phase "strategy," or upon the basis of which counsel could make professionally

competent "tactical choices," when it became time to present mitigation evidence.

The mere invocation of the term "strategy" by the Alabama Court of Criminal

Appeals does not result in its spontaneous materialization. The word "strategy" is

defined as meaning, among other things, "**2a:** a careful plan or method; a clever

stratagem, **b:** the art of devising or employing plans or stratagems toward a goal."

*Webster's Third New International Dictionary* 2256 (2002). The purported "goal"

of Boyd's trial counsel was that of "humaniz[ing him], so to speak." PCR Vol. 16 at

132, 153; Tab P-51. However, the only member of Boyd's defense team who testified

at the Rule 32 hearing candidly admitted no plan or method of attaining that goal was

52

devised prior to trial. The direction to Boyd's sister, to draft a short history of his life for recitation to the jury, was the product of exigency — not competent, professional deliberation and forethought.

Thus, this court concludes that petitioner has "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065, 80 L. Ed. 2d 674 (1984) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)); *see also Fugate v. Head*, 261 F.3d 1206, 1217 (11th Cir. 2001) (observing that "a complete failure to investigate may constitute deficient performance of counsel"); *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) ("A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history.").

This court also has carefully reviewed Boyd's companion claim that his case contains facts which are materially indistinguishable from those addressed by the United States Supreme Court in *Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); and, because the Alabama Court of Criminal Appeals arrived at a result different from that reached by the Supreme Court in *Williams*, the state court decision is "contrary to" clearly established federal law. A review of the facts of both cases establishes that they are materially indistinguishable in significant

53

respects: *e.g.*, Boyd and the defendant in *Williams* both endured "nightmarish"[27] and "terrible"[28] childhoods; trial counsel in both cases called only four witnesses during the penalty phase;[29] and, the failure of trial counsel to present meaningful mitigation information based upon each defendant's background was not the result of a consciously devised strategy, but was instead the product of a complete lack of preparation for the penalty phase of trial.[30] In both cases, trial counsel did not conduct even a desultory investigation, but procrastinated until the last moment to "prepare" a case for life.[31]

---

[27] *Williams*, 529 U. S. at 395, 120 S Ct. at 1514.

[28] *Boyd*, 746 So.2d at 377.

[29] *See supra* note 24 (pertaining to the witnesses called at Boyd's trial) and *Williams v. Taylor*, 529 U.S. at 369, 120 S. Ct. at 1500, where the Court recorded that:

> The evidence offered by Williams' trial counsel at the sentencing hearing [penalty phase] consisted of the testimony of Williams mother, two neighbors, and a taped excerpt from a statement by a psychiatrist. One of the neighbors had not been previously interviewed by defense counsel, but was noticed by counsel in the audience during the proceedings and asked to testify on the spot. The three witnesses briefly described Williams as a "nice boy" and not a violent person. The recorded psychiatrist's testimony did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone. [Citation to record omitted.]

[30] *See Williams*, 529 U. S. at 372-73, 120 S. Ct. at 1502.

[31] As the Supreme Court said in *Williams*,

> [t]he record establishes that counsel did not begin to prepare for that [the penalty] phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had

54

Nevertheless, there also are significant distinctions between the set of facts

confronted by the Supreme Court in *Williams* and those of this case. For example,

the jury in *Williams* "found a probability of future dangerousness and unanimously

fixed Williams' punishment at death,"[32] while a majority of the jurors in this case

recommended a sentence of life without parole. Further, the trial judge in *Williams*

did not override the jury's recommendation, but instead "concluded that such

punishment was 'proper' and 'just' and imposed the death sentence,"[33] while the trial

judge in this case rejected the jury's recommendation and sentenced Boyd to death.

Moreover, "the same judge who had presided over Williams' trial and sentencing"

conducted the hearing on his state petition for post-conviction relief, and concluded

---

been severely and repeatedly beaten by his father, that he had been committed to the
custody of the social services bureau for two years during his parents' incarceration
(including one stint in an abusive foster home), and then, after his parents were
released from prison, had been returned to his parents' custody.

   Counsel failed to introduce available evidence that Williams was "borderline
mentally retarded" and did not advance beyond sixth grade in school. They failed to
seek prison records recording Williams' commendations for helping to crack a prison
drug ring and for returning a guard's missing wallet, or the testimony of prison
officials who described Williams as among the inmates "least likely to act in a
violent, dangerous or provocative way." Counsel failed even to return the phone call
of a certified public accountant who had offered to testify that he had visited
Williams frequently when Williams was incarcerated as part of a prison ministry
program, that Williams "seemed to thrive in a more regimented and structured
environment," and that Williams was proud of the carpentry degree he earned while
in prison.

529 U.S. at 395-96, 120 S. Ct. at 1514 (footnote and citations omitted).

   [32] *Id.* at 370, 120 S. Ct. at 1500-01.

   [33] *Id.*

on the basis of the evidence presented that trial counsel had been ineffective during the penalty phase of trial — a conclusion that led him to recommend "that Williams be granted a rehearing on the sentencing phase of his trial"[34] — whereas, Boyd's Rule 32 petition was decided by a different judge, who rejected his ineffective assistance of counsel claims.

There are other facts in *Williams* that are distinguishable from the facts of this case. For instance, Terry Williams was "borderline mentally retarded," whereas there is no real dispute that Boyd is at least of average intelligence. *Williams*, 529 U.S. at 396.[35] Further, unlike Boyd's offense, law enforcement officials did not even know a crime had been committed until Williams, incarcerated on another matter, wrote a letter to the police, apologizing for and confessing to a murder and another unrelated, but serious, violent crime. *Id.* at 367. This confession came six months after the victim's death, which initially had been determined to be caused by blood alcohol poisoning. *Id.* Finally, the nature of the murder for which Williams was prosecuted is radically different from the sequence of events leading to the death of the Blackmons. *Id.* at 368.[36]

---

[34] 529 U.S. at 370-71, 120 S. Ct. at 1501.

[35] *See supra* note 31 (second paragraph).

[36] In *Williams*, the defendant entered the home of Dee Dee Stone, and encountered her drunken father, Mr. Stone, in bed. *Williams v. Taylor*, 529 U.S. 362, 368 (2000). Williams became angry when Stone refused to loan him a meager amount of money. *Id.* After a verbal argument over the money, Williams wanted "to get back" at Stone, so he picked up a mattock (after consciously

Of course, the *Williams* decision also was delivered on April 18, 2000,

*subsequent to* the conclusion of the state trial and appellate courts' consideration of

Boyd's Rule 32 petition, but prior to the date his habeas petition was filed in this

court. Even so, the principles of federal law on which the Supreme Court reached its

decision in *Williams* were well established by the Court's 1984 decision in *Strickland*

*v. Washington*, *supra*. Stated differently, the *Williams* opinion merely amounted to

an exposition of the manner in which those settled principles applied to the particular

set of facts presented.

> [E]rrors that undermine confidence in the fundamental fairness of the
> state adjudication certainly justify the issuance of the federal writ. *See*,
> *e.g.*, *Teague v. Lane*, 489 U.S. 288, 311-314, 109 S. Ct. 1060, 103 L. Ed.
> 2d 334 (1989) (quoting *Mackey v. United States*, 401 U.S. 667, 692-694,
> 91 S. Ct. 1160, 28 L. Ed. 2d 404 (1971) (Harlan, J., concurring in
> judgments in part and dissenting in part), and quoting *Rose v. Lundy*,
> 455 U.S. 509, 544, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982)
> (STEVENS, J., dissenting)). The deprivation of the right to the effective
> assistance of counsel recognized in *Strickland* is such an error.
> *Strickland*, 466 U.S., at 686, 697-698, 104 S. Ct. 2052.
>
> . . . .
>
> The threshold question under AEDPA is whether Williams seeks to
> apply a rule of law that was clearly established at the time his state-court
> conviction became final. That question is easily answered because the
> merits of his claim are squarely governed by our holding in *Strickland*
> *v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

---

deciding not to choose a butcher knife from the kitchen), and hit Stone in the chest. *Id.* Williams
took three dollars, and declared that Stone was gasping for breath as he left the home. *Id.*

57

*Williams v. Taylor*, 529 U.S. at 375, 390, 120 S. Ct. at 1503-04, 1511.[37]

Regardless of the applicability of *Williams*, this court still concludes that Boyd

has overcome the presumption of correctness attendant to the mixed fact and law

finding of the state courts regarding the effectiveness of his trial counsel. The

performance of Boyd's trial counsel was objectively deficient, because clear and

convincing evidence establishes that counsel failed to investigate Boyd's character

---

[37] *See also Williams*, 529 U.S. at 413-15, 120 S. Ct. at 1523-24, where Justice O'Connor
wrote:

Although I disagree with Justice STEVENS concerning the standard we must
apply under § 2254(d)(1) in evaluating Terry Williams' claims on habeas, I agree
with the Court that the Virginia Supreme Court's adjudication of Williams' claim of
ineffective assistance of counsel resulted in a decision that was both contrary to and
involved an unreasonable application of this Court's clearly established precedent.
Specifically, I believe that the Court's discussion in Parts III and IV is correct and
that it demonstrates the reasons that the Virginia Supreme Court's decision in
Williams' case, even under the interpretation of § 2254(d)(1) I have set forth above,
was both contrary to and involved an unreasonable application of our precedent.

First, I agree with the Court that our decision in *Strickland* undoubtedly
qualifies as "clearly established Federal law, as determined by the Supreme Court of
the United States," within the meaning of § 2254(d)(1). *See ante*, at 1512. Second,
I agree that the Virginia Supreme Court's decision was contrary to that clearly
established federal law to the extent it held that our decision in *Lockhart v. Fretwell*,
506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993), somehow modified or
supplanted the rule set forth in *Strickland*. *See ante*, at 1512-1513, 1515. . . .

. . . .

Third, I also agree with the Court that, to the extent the Virginia Supreme
Court did apply *Strickland*, its application was unreasonable. *See ante*, at 1514-1516.
As the Court correctly recounts, Williams' trial counsel failed to conduct an
investigation that would have uncovered substantial amounts of mitigation evidence.
*See ante*, at 1514-1515. . . .

58

and background in preparation for the penalty phase of trial. *See, e.g., Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.") (citing *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986)). Further, there was a "wealth" of mitigating information that could have been uncovered in a reasonably competent investigation. Finally, counsels' last-minute effort to cobble together at least *something* in the nature of mitigating evidence was the product of exigent circumstances — *not* a tactical decision made on the basis of a preconceived and professionally competent strategy. These errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" to the United States Constitution as made applicable to the states by the Fourteenth Amendment. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. For all of these reasons, the Alabama Court of Criminal Appeals erred when concluding that the performance of Boyd's trial attorneys was not objectively deficient. Such a ruling represented an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States in *Strickland v. Washington*, *supra*, and "reveals an obvious failure to consider the totality of the omitted mitigation evidence." *Williams*, 529 U.S. at 416, 120 S. Ct. at 1525 (O'Connor, J.).

59

**b.** **Did the failure to present more mitigating evidence during the penalty phase prejudice Boyd?**

A finding that the performance of Boyd's trial attorneys was objectively

deficient only satisfies the first, or "performance," prong of the *Strickland* standard,

however, and does not end this court's inquiry.

> We examine claims of ineffective assistance of counsel under the Sixth
> Amendment through the two-part analysis set forth by the Supreme
> Court in *Strickland*. Under this test, the petitioner must first show that
> "counsel made errors so serious that counsel was not functioning as the
> 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466
> U.S. at 687, 104 S. Ct. at 2064. If this substantial showing is made, the
> petitioner must then demonstrate that "the deficient performance
> prejudiced the defense," which "requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable." *Id.* As the Supreme Court has explained, "[u]nless
> a defendant makes both showings, it cannot be said that the conviction
> . . . resulted from a breakdown in the adversary process that renders the
> result unreliable." *Id.*

*Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002).

In order to satisfy the second, or "prejudice" prong of *Strickland*, Boyd must

prove that he "suffered *actual prejudice* due to the ineffectiveness of his trial counsel

before relief will be granted." *Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir.

1988) (emphasis in original). To establish "actual prejudice," Boyd "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

Boyd has not satisfied — indeed, as a matter of clearly established circuit precedent he cannot satisfy — this standard. Despite his attorneys' pathetically incomplete and objectively deficient performance in preparing and presenting a case for life during the penalty phase of trial, a majority of the jurors still recommended that Boyd be sentenced to life without the possibility of parole. *See Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1998) (holding that, even assuming the performance of defense counsel was deficient, "Mills cannot demonstrate that the alleged failure to present mitigating evidence prejudiced him at the penalty phase because the jury recommended a life sentence"); *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir. 1994) ("Routly cannot show that any failure to present mitigating evidence to the jury prejudiced him to any degree whatsoever because the jury recommended a sentence of life imprisonment anyway.").

## 2. Failure to attempt to secure a sentence of life without parole from trial judge (Claim B in Petition)

Boyd contends that his trial attorneys were constitutionally ineffective during the third, "sentencing phase," of trial — the sentencing hearing conducted before the trial judge, the ultimate sentencing authority under Alabama law. *See Beck v. State*,

61

396 So. 2d 645 (Ala. 1980); *see also*, *e.g.*, *Coral v. State*, 628 So. 2d 988 (Ala. Crim.

App. 1992), *aff'd*, *Ex parte Coral*, 628 So. 2d 1004 (Ala. 1993); *Bush v. State*, 431

So. 2d 555 (Ala. Crim. App. 1982), *aff'd*, *Ex parte Bush*, 431 So. 2d 563 (Ala.), *cert.*

*denied*, 464 U.S. 865 (1983).

Boyd claims that his trial counsel failed to present sufficient mitigating

evidence to persuade the trial judge to ratify the jury's recommendation that he be

sentenced to life without parole.

> The standard for ineffective assistance of counsel remains the same in
> the sentencing portion of a capital case as it is at the guilt/innocence
> phase [or the penalty phase of the jury trial]. Again, in order to prove a
> Sixth Amendment violation, a petitioner must show that counsel
> performed deficiently, and second that the deficient performance
> prejudiced the defense.

*Brownlee*, 306 F.3d at 1067-68 (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at

2064).

Boyd raised this claim during state post-conviction proceedings and the

Alabama Court of Criminal Appeals made the following findings, among others, with

respect to it:

> Boyd contends that trial counsel failed to present a strategy to
> save his life and that counsel otherwise failed to properly represent him
> at the sentencing hearing before the trial court. According to Boyd:

>> "[Trial counsel] failed to present any mitigation, including
>> evidence of the serious abuse he suffered as a child; the neglect

62

of his parents; the chaotic and dysfunctional homes in which he was reared; the alcoholism in his home; the poverty, inadequate food, and lack of medical care; the effect of all of this on his development; or the evidence of those in the community who worried about him as he grew up. . . . They neither sought nor presented evidence pertaining to the culpability and background of the codefendant, nor records documenting the family instability, or other evidence that would have supported a case for life imprisonment without parole. They did not present any expert testimony. Abundant evidence was available for the trial court's consideration but was not discovered or used. . . . Counsel's dropping the ball after the jury's recommendation and their total failure to investigate, explore, prepare and present any of this evidence was grossly ineffective. . . . This Court must reverse the court below and require a new judge [for] sentencing in this case.

"These were not the only deficiencies in counsel's performance. Trial counsel also failed to make effective arguments before the sentencing court as to why it should accept the jury's verdict. Counsel failed to object to the admission into evidence of a prejudicial presentence investigation report which included inadmissible hearsay, the fruits of an uncounseled interview with petitioner, a recounting of the effects of the crime on the victims' family, juvenile arrests, the personal commentary of the author, and the victim's families' desire for death. . . . Trial counsel failed to object to the use of improper and invalid convictions to negate the mitigating circumstance of no significant prior criminal history. . . .

"Finally, trial counsel failed to object to the impropriety of the trial court's rejecting the jury life verdict in this case on equal protection, due process, and Eighth Amendment grounds. . . . They failed to object to the court's improper reliance on invalid aggravating circumstances, including a lack of sufficient evidence, double counting, and the vagueness of the heinousness factor. They did not contest the trial court's rejection of

established mitigating circumstances and made no inquiry into possible bias by the trial judge. . . .

"Trial counsel's performance was grossly deficient at the most important stage of these proceedings. Had they advocated properly, William Glenn Boyd would not have been sentenced to death. . . ."

(Appellant's brief at pp. 25-27.)

Trial counsel stated that the defense strategy was to humanize Boyd for the jury. Four witnesses were presented during the penalty phase in this effort. *For the reasons stated in Part I.A of this opinion, we do not find counsel's efforts to be ineffective.* Moreover, § 13A-5-47, Ala. Code 1975, governs the determination of sentence by the trial court. Section 13A-5-47, Ala. Code 1975, does not provide for the presentation of additional mitigation evidence at sentencing by the trial court. Therefore, trial counsel did not err in failing to do so.[38]

---

[38] The conclusion of the Court of Criminal Appeals that Alabama law "does not provide for the presentation of additional mitigating evidence at sentencing by the trial court" is error as a matter of both state and clearly established federal law. The following statutory language clearly contemplates that additional evidence may be submitted to the ultimate sentencing authority:

Based upon the evidence presented at trial, *the evidence presented during the sentence hearing*, and the pre-sentence investigation report *and any evidence submitted in connection with it*, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, *each mitigating circumstance enumerated in Section 13A-5-51*, and *any additional mitigating circumstances offered pursuant to Section 13A-5-52*. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.

Ala. Code § 13A-5-47(d) (emphasis added). In any event, the Supreme Court's decision in *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), firmly established this proposition:

[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

64

A presentence report is entirely hearsay but admissible under § 13A-5-47, Ala. Code 1975. *Dill v. State*, 600 So. 2d 343 (Ala. Cr. App. 1991), *aff'd*, 600 So. 2d 372 (Ala.1992). Therefore, trial counsel did not err in failing to object to the presentence report.

Other assertions of ineffective assistance of counsel under the heading I.P. in the appellant's brief to this court are based on mere assertions and conclusions and have been insufficiently pleaded without the necessary specificity. Rule 32.3 and Rule 32.6(b), Ala. R. Crim. P.

Boyd has not shown that trial counsel's performance was deficient or that he was prejudiced by counsel's deficient performance. Nor has he shown that counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Nor has Boyd shown regarding these claims that there is a reasonable probability that, if trial counsel had objected on this ground, the result of the trial would have been different.

*Boyd v. State*, 746 So. 2d at 397-98 (bracketed alterations in original) (emphasis

added).

As noted in the emphasized portion of the preceding quotation, the state court's

conclusion that Boyd's attorneys were not constitutionally ineffective at sentencing

also is bottomed on findings set forth in a previous part of the opinion (*i.e.*, "For the

---

*Id*. at 604, 98 S. Ct. at 2964-65 (emphasis in original). The Court added that *any* statute

that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, the risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

*Id*. at 605, 98 S. Ct. at 2965.

reasons stated in Part I.A of this opinion, we do not find counsel's efforts to be

ineffective"). *Boyd v. State*, 746 So. 2d at 398. The following extracts from Part I.A

of the Court's opinion constitute the essence of its reasoning with regard to the

performance of trial counsel during the third-stage, sentencing hearing:

> *Boyd claims that his trial counsel failed to present sufficient mitigating evidence to dissuade the trial court from overriding the jury's recommendation.* At the Rule 32 hearing, Boyd presented a wealth of testimony characterizing his childhood as consisting of continual gross poverty; gross physical and emotional abuse; gross neglect; and various humiliations. . . .
>
> . . . .
>
> *The trial court in this case chose to override the jury's recommendation because the aggravating circumstances greatly outweighed the mitigating circumstances.* . . .
>
> Boyd has not shown that the lack of psychological evidence or any other evidence at the sentencing phase prejudiced him. In fact, the evidence suggested that Boyd's childhood, although terrible, was not a factor in his committing two murders. Although family and friends testified at the Rule 32 hearing that Boyd had endured a terrible childhood and mental health experts testified in an effort to connect Boyd's childhood to his participation in the double murder, it was the conclusion of each expert that, at the time of the murders, Boyd knew right from wrong but made a choice to commit murder. *We do not believe that this additional evidence would have shifted the balance between the aggravating circumstances and the mitigating circumstances* and changed the outcome of the trial.
>
> . . . .
>
> Moreover, even if the alleged failure to present mitigating

evidence was an oversight and not a tactical choice by counsel, it was harmless error. *In overruling the jury's recommendation and sentencing Boyd to death, the trial court found that these crimes were* "extremely wicked and shockingly evil." *The trial court continued*: "all Capital offenses are heinous atrocious and cruel to some extent, but the degree of heinousness and cruelty in these offenses far exceeds that which is common to all Capital offenses." *Boyd*, 542 So. 2d at 1268. Although it was established at the Rule 32 hearing that Boyd had had a traumatic and unhappy childhood, there was also testimony that he knew right from wrong and that he had just made a bad decision in committing a double murder. *Had the testimony presented at the Rule 32 hearing regarding Boyd's childhood been presented at the sentencing hearing it is highly unlikely that the trial court would have been persuaded to sentence Boyd differently.*

We cannot say that Boyd's counsel's performance was deficient or that Boyd suffered prejudice because counsel failed to call additional mitigation witnesses at sentencing.

*Boyd v. State*, 746 So. 2d at 377, 378, 379 (emphasis supplied).

In contradiction of the state court's findings, Boyd submits that none of his

three trial attorneys took responsibility for the sentencing hearing, and they prepared

no strategy to save his life when they appeared before the trial judge for sentencing.

Doc. no. 1, at 12.[39] The second prong of this contention was acknowledged by the

---

[39] (Doc. 1 at 14). In his first brief in support of his petition for writ of habeas corpus, Boyd embarks on a litany of additional claims against his trial counsel in support of his assertion that he was ineffectively represented at the sentencing phase of trial (doc. 27 at 28-29). These claims were presented to the Alabama Court of Criminal Appeals on collateral review, but were absent from his petition filed in federal district court on October 16, 2000. *See respectively, Boyd*, 746 So. 2d at 398; Appellant's Brief on Collateral Appeal, PCR Tab 54, at 25-28; and doc. 1 at 12-14.

On October 27, 2000, petitioner was directed to, within thirty (30) days of the entry date of the order, either amend his petition to state each and every ground for relief, "or file written notice stating that all such grounds have been included in the petition as filed and that no amendment is required." On December 1, 2000, plaintiff filed a written notice stating that all grounds were

Alabama Court of Criminal Appeals, when it observed that Boyd's lead defense lawyer, Stephen Levinson, admitted "*the defense did not plan a strategy for the sentencing hearing.*" *Boyd v. State,* 746 So. 2d at 379 (emphasis supplied).

Nineteen days passed between the end of jury deliberations (March 20, 1987) and the sentencing hearing (April 9, 1987); even so, defense counsel took no effective steps to prepare a case for life. Instead, counsel simply *assumed* the trial judge would follow the jury's recommendation — a leap of faith that Levinson admitted, in gross understatement, to have been "stupid." Doc. no. 1, at 12 (quoting PCR Vol. 16, at 145). Because of their professionally unsound reliance upon a false assumption, defense counsel offered no evidence, and barely made an argument, during the

included in his original petition (doc. 10). The brief in support of his petition for writ of habeas corpus was not filed until May 23, 2001 (doc. 27). Petitioner has never moved to amend his petition to state additional claims. Thus, those additional claims, as set out in the first brief in support of his petition for writ of habeas corpus shall not be considered.

Even if this court were to consider these allegations as additional ineffective assistance of counsel claims, a careful review of same shows that the Alabama Court of Criminal Appeals properly decided counsel was not ineffective for failing to object to the presentence report as hearsay because § 13A-5-47 of the Code of Alabama, 1975, allows the report to be considered admissible evidence. *Boyd*, 746 So. 2d at 398. With regard to the remaining claims, the appellate court correctly determined that same are "based on mere assertions and conclusions and have been pleaded without the necessary specificity. Rule 32.3 and Rule 32.6(b)." *Id.* Rule 32.3 places the burden on petitioner to plead and prove "by a preponderance of the evidence the facts necessary to entitle petitioner to relief." Rule 32.6(b) requires that a petition "contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." The appellate court's decisions will not be disturbed because same rested on state law grounds that are independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U. S. 722, 729, 111 S. Ct. 2546, 2553-2554, 115 L. Ed. 2d 640 (1991).

sentencing hearing.[40]

For these reasons, plus others discussed in the preceding part of this opinion, the court concludes that Boyd satisfied the first, or "performance," prong of the *Strickland* standard. Even so, this court agrees with the conclusion of the Alabama Court of Criminal Appeals, that Boyd cannot satisfy the second, or "prejudice," prong, which "focuses on whether 'the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Boyd v. State*, 746 So. 2d at 378 (quoting *Bui v. State*, 717 So. 2d 6, 22 (Ala. Crim. App. 1997) (in turn quoting *Stevens v. Zant*, 968 F.2d 1076, 1081 (11th Cir. 1992)).

Boyd's argument — *i.e.*, *if* his attorneys had competently prepared a mitigation case, and *if* more than seven jurors had voted in favor of life, then the trial judge *might* have accepted the jury's advisory verdict — amounts to a speculative foray into conceivable, but imponderable, outcomes. "On the prejudice issue, the petitioner must show that, but for counsel's unprofessional errors, there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty." *Bush v. Singletary*, 988 F.2d 1082, 1090 (11th Cir. 1993) (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068); *see also Weeks v. Jones*, 26 F.3d 1030, 1042 (11th Cir.

---

[40] *See* PCR Vol. 16, 127-145.

1994) (same). The requirement that Boyd show a "reasonable probability" that the result of the sentencing hearing before the trial judge would have been different, but for counsel's unprofessional errors, is a standard of proof that requires more than some speculative, "conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067.

## 3. Alabama's scheme for compensating attorneys appointed to represent defendants accused of capital offenses compromised the performance of Boyd's counsel (Claim H-1 in Petition)

Boyd claims that he was denied effective assistance of counsel because his attorneys were underpaid for their work, and alleges that his attorneys would have lost money if they had properly prepared for his trial. Boyd claims that his attorneys were paid for only fifty hours of work, and that more time and resources were required for: pretrial litigation concerning change of venue, suppression of evidence, and other issues; experts on mental health and scientific issues for both phases of the trial; interviews of family members for mitigation evidence; research and writing in connection with motion practice; locating witnesses and evidence; and, keeping abreast of the ever-changing, fluid developments in capital law. Boyd argues that efforts such as these were not possible, given the state monetary constraints in effect at the time of his trial. Finally, Boyd maintains that the paucity of state funding provided no economic incentive for his attorneys to provide him an adequate defense.

70

Petitioner raised this claim in his state Rule 32 petition, and the Alabama Court

of Criminal Appeals held that it was procedurally barred, but also that it was without

merit because Boyd had failed to demonstrate that his trial attorneys had less

incentive to render effective assistance due to financial constraints.

I.V.

Boyd contends that he was denied effective assistance of trial and appellate counsel *because of* the extremely low compensation provided by the State of Alabama for the defense attorneys representing capital defendants. He argues that the present payment scheme provides "a *disincentive* to do work necessary to defend their client properly." (Appellant's brief at p. 38.) (Emphasis in appellant's brief.). In support of this claim, Levinson testified at the Rule 32 hearing that representing Boyd was a financial hardship that resulted in his losing money. He further testified that the payment that he did receive was insignificant. (Vol.16, R 109.) According to Boyd: "Failing to pay his lawyers adequately for litigating one of the most difficult and trying cases violated various guarantees under the Alabama and federal constitutions, including the promise of equal protection for the indigent, due process of law, and effective representation, and constitutes a taking of the lawyer's property without just compensation." (Appellant's brief at p. 38.)

Although included as a claim alleging ineffective assistance of counsel, this claim does not challenge the effectiveness of counsel. Boyd argues that *because of* low funding counsel had no incentive to perform. Boyd does not allege an instance where counsel did not perform effectively because of funding. Therefore, this claim is precluded from review in a Rule 32 petition because it could have been, but was not, raised and addressed at trial and on direct appeal. Rule 32.2(a)(3), and (5), Ala. R. Crim. P.

However, to the extent, if any, that the argument can be construed as asserting that Boyd's counsel was ineffective because of limited

71

funds, we conclude that there has been no specific assertion that Boyd's counsel failed to provide effective assistance due to the lack of State provided funds. Therefore, Boyd has not met either his burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), Ala. R. Crim. P. Boyd has not shown that because of low funding trial counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S. Ct. 2052. Nor has Boyd shown that there is a reasonable probability that, if trial counsel had been paid more for defending Boyd, the result of the trial would have been different.

*Boyd*, 746 So. 2d at 403 (emphasis in original). Petitioner accordingly is precluded

from raising this claim in this court, as is discussed more fully *infra*, in the Procedural

Default section of this Opinion.

## 4. Failure to seek expert assistance for the pretrial, trial, and sentencing proceedings (Claim H-2 in Petition)

Boyd claims that his trial attorneys were ineffective for failing to seek the

assistance of ballistics and firearms experts, a pathology specialist, and an expert who

could have explained how Boyd's background affected his development and

judgment as a young adult. Boyd raised this claim during state post-conviction

proceedings, and the Alabama Court of Criminal Appeals made the following

findings:

I.J.

Boyd contends that trial counsel failed to seek appropriate expert assistance for the pretrial, trial, and sentencing proceedings. Boyd argues:

72

"While trial counsel sought the assistance of a mental health expert and saw their motion denied . . . they did not pursue the need for other experts in an effort to fight the state's case for a capital conviction and sentence of death. Had they obtained such assistance, they would have been able to raise sufficient doubts to preclude a capital conviction and the ultimate imposition of [a] death sentence.

"For example, trial counsel did not move the court for funds for a ballistics and firearms expert despite the fact that they had no training or expertise in these fields. . . . Had they done so, they would have been able to present evidence demonstrating that the shots fired at Evelyn Blackmon were more consistent with bullets fired from the .25, the gun possessed by codefendant Robert Milstead. . . . The State's forensic experts could have been cross-examined credibly with the help of a ballistics specialist with regard to which firearm likely shot the bullets that resulted in each wound. Similarly, the damaging testimony about the use of an ax to 'chop' Evelyn Blackmon would have been impeached with proper cross-examination about toolmark identification and the attributes of the allegedly used ax. . . . The assistance of an expert on these matters also would have led to proper impeachment of state witness David Higgins regarding the inadequacies in his testing to determine the actual use of each gun. . . .

"The defense had equal need for a specialist in pathology. A pathologist would have countered the state's theory that the victims lingered before they died, thereby challenging the state's ability to rely on the heinous, atrocious, or cruel aggravating factor and the trial court's finding of the same. A defense pathologist also would have challenged the unfounded speculations about what was allegedly done to Mrs. Blackmon both before and after her death. . . . Such expertise would have been critical in challenging the state's expert as well as the testimony of the codefendant. . . .

73

"In addition to failing to investigate Mr. Boyd's troubled background . . . trial counsel also failed to seek the services of a specialist who could have explained to jury and judge why growing up in an environment characterized by abuse, neglect, and alcoholism put petitioner at great risk for behaving violently himself. . . . Such an expert would have presented numerous mitigating factors and demonstrated for the factfinders how petitioner's background would have affected his development and judgment as a young adult. Counsel were also ineffective for making their one request for psychiatric assistance in open court rather than ex parte, as the state opposed the request and convinced the trial court to send Mr. Boyd to the state mental hospital over defense objection rather than provide a trained professional to explain the effects of petitioner's upbringing on his psychological make-up. . . . Had trial counsel made a proper and thorough argument detailing the need for mental health assistance and done so out of the presence of the district attorney, they would have received the aid of a psychiatric expert to work with rather than against the defense in pretrial, trial and sentencing proceedings.

"Trial counsel needed such expert assistance. They were not themselves trained in any of these areas . . . and they had the testimony of a number of state experts to rebut. *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985) had been decided prior to Mr. Boyd's capital trial. His attorney's failure to secure expert assistance in this complex case was deficient performance that prejudiced petitioner at all phases of his capital trial."

(Appellant's brief at pp. 17-20) (footnote omitted).

Boyd was evaluated by a licensed psychologist before trial. It was trial counsel's opinion that the report generated from this evaluation was not particularly helpful in his defense. Boyd disagrees with this assessment but offers nothing specific in rebuttal. (Appellant's reply brief at p. 12.)

Moreover, Dr. Joseph Burton, a pathologist; Carl Majesky, a consultant in firearms; Dr. Louis Mulry Tetlow, a psychologist; and Jan Vogelsang, a social worker, testified at the Rule 32 hearing. While their testimony was intended to be favorable to Boyd, and in some aspects appears to be so on the surface, none of the testimony presented at the Rule 32 hearing from these experts conclusively supports the claims quoted above. In the final analysis, all the testimony was either reconciled with the opinions of the State's experts or its reliability was called into question. For instance, Burton stated that the victims' bodies had stayed underwater too long to determine when specific injuries were inflicted; Majesky's qualifications were questionable and he did not know the effect of decomposition of the victims' bodies; Tetlow and Vogelsang said Boyd's actions were the result of bad decision-making on his part. Boyd has not shown that trial counsel's performance was deficient or that he was prejudiced. He has not shown that counsel's failure to call additional experts was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Moreover, Boyd has not shown that additional testimony would have changed the outcome of the case.

*Boyd*, 746 So. 2d at 391-92.

Boyd again raises these same claims before this court. He argues that a ballistics expert would have been able to prove that the shots fired at Evelyn Blackmon were more consistent with the shots fired from his co-defendant's gun than from the one he wielded; and that a ballistics expert would have made it possible for his trial counsel to credibly cross-examine the state's forensic experts about which firearm caused each injury, as well as the attributes of the ax used to chop Evelyn Blackmon. Boyd maintains that this evidence would have shown that the state's key witness, Boyd's co-defendant, was lying. Boyd further claims that a pathologist

would have countered the state's theory that the victims lingered before they died, and challenged the unfounded speculation about what was done to Evelyn Blackmon before and after she died. He adds that an expert should have been called to explain how Boyd's background affected his development and put him at a great risk for behaving violently. Finally, Boyd claims that his attorneys were ineffective for making their one request for psychiatric assistance in open court rather than *ex parte*, since the state opposed the request and convinced the court to send Boyd to a state mental facility over defense objections. Boyd concludes that if his attorneys had obtained assistance from these various sources, they would have been able to raise sufficient doubts to preclude a capital conviction and the ultimate imposition of the death sentence.

In deciding this claim on appeal from the denial of Boyd's Rule 32 petition, the Alabama Court of Criminal Appeals correctly identified the *Strickland* standard as the appropriate standard for review of claims of ineffective assistance of counsel. *Boyd*, 746 So. 2d at 374-76, 392. By correctly identifying *Strickland* as the controlling legal standard, the Alabama Court of Criminal Appeals did not reach a conclusion different from the United States Supreme Court on a question of law. Boyd also has not cited a decision in which the United States Supreme Court, faced with materially indistinguishable facts, reached a decision different from the decision

76

of the state court in his case. Thus, the state court's decision was not "contrary to" clearly established federal law, as determined by the Supreme Court.

Boyd nevertheless argues that the state court's decision was an unreasonable application of *Strickland*, in that the court "looked to the testimony of each of the experts only to see whether it in and of itself would have exculpated Mr. Boyd of capital murder," which is "not the correct analysis under *Strickland*." Boyd contends that,

[h]ad trial counsel investigated, hired experts, and been properly prepared to cross examine and present scientific testimony, the jury and judge would have been able to see that the state's key and only eyewitness was fabricating. Had they known that, the outcome of the trial and sentencing would have been different.

Doc. 27, at 69-70.

It may be true that, if the state jury and trial judge were convinced that Milstead's testimony was not credible, Boyd might have been sentenced differently. Even so, there is nothing to indicate that the expert testimony petitioner claims should have been presented would have convinced either the jury or judge that his co-defendant did not testify truthfully. Boyd's expert testimony was presented at the Rule 32 hearing, and the state appellate court found that "all the testimony was either reconciled with the opinions of the State's experts or its reliability was called into question." *Boyd*, 746 So. 2d at 392. Additionally, the state appellate court noted that

77

Boyd was evaluated by a licensed psychologist prior to trial, and that his trial counsel

did not believe the psychologist's report was helpful to the defense. *Id.* Therefore,

the trial court's conclusion that counsel's failure to call additional expert witnesses

at trial was not deficient and did not prejudice petitioner was not objectively

unreasonable.

## 5.   Failure to preserve Boyd's right to be free from double jeopardy
(Claim H-3 in Petition)

Boyd contends that his trial attorneys were ineffective for failing to preserve

his right to be free from double jeopardy. Boyd raised this claim during state post-

conviction proceedings, and the Alabama Court of Criminal Appeals made the

following findings:

I.B. and V.

Boyd claims that his constitutional right to be free from double
jeopardy was violated and that his trial counsel was ineffective for
failing to assert that violation.

. . . .

Boyd was tried and convicted of eight counts of capital murder for
the deaths of two people. According to Boyd, "[t]he State's [act of]
slicing up this offense into eight different counts deprived Mr. Boyd of
his right to be free from double jeopardy under state and federal law."
(Appellant's brief at p. 7.) He argues that "his trial counsel did not
properly challenge this multiplicity of counts or the fact that Mr. Boyd
was charged with separate crimes that were not even offenses
themselves under Alabama law (e.g., 'murder during a kidnapping with
intent to terrorize')." Boyd also asserts that this issue was not presented

78

on direct appeal.

According to Boyd,

"Had his trial counsel properly challenged this overcounting, Mr. Boyd would have gone to trial on a smaller number of legally-cognizable counts of murder. A jury faced with fewer counts of murder would be less likely to be overwhelmed by the charges or to see the defendant before them as a unrestrained killer. Not only might this have made individual jurors less prone to convict, but the jury would likely have recommended life-without-parole by a larger margin, which also would likely have had an effect on the judges's final sentence. But for counsel's failure, the results of Mr. Boyd's trial and sentencing would have been different."

(Appellant's brief at p. 8.)

Levinson testified at the Rule 32 hearing that Boyd's original appointed counsel, Levinson's predecessor, had filed a motion objecting to the indictment. That motion was denied. Levinson stated that when he was appointed to represent Boyd, he adopted and ratified prior counsel's motions. Therefore, trial counsel was not ineffective on this ground because trial counsel's performance was not deficient.

Moreover, we agree with the State's assertion that *Hyde v. State*, [Ms. CR- 95-2036, January 30, 1998] [778] So. 2d [199] (Ala. CR App. 1998), is dispositive of this claim and shows that Boyd was not prejudiced by counsel's performance. In *Hyde* we stated:

"The United States Supreme Court has explained the purpose of the Double Jeopardy Clause as follows:

"'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same

offense.'

"*North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989).

"'The Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983). In this case, the appellant was not prosecuted a second time for the same offense after an acquittal or after a conviction. Therefore, we must determine only whether the appellant is being punished multiple times for the same offense or is receiving a greater punishment than the legislature intended. Because this case involved the death penalty, the appellant cannot be punished twice for the same offense. He 'has only been sentenced to die once, and indeed, can only be put to death once.' *Ex parte McWilliams*, 640 So. 2d 1015, 1022 (Ala. 1993). Furthermore, even if the appellant's right to be free from double jeopardy was violated by the two convictions for the murder of a single witness, any error is harmless. If one conviction for the murder of a witness was void, the convictions for the other count of murder of a witness and for murder during a burglary would remain, and either conviction would be sufficient to support a death sentence. *Id.*

"The appellant's argument that, during the sentencing phase, the jurors might have been influenced by the number of convictions is refuted by the fact that the jury recommended a sentence of life imprisonment without parole. His argument that the trial court, in sentencing him, considered the fact that he had multiple convictions is also without merit. In its statement of the facts of the case, the trial court simply indicated that the appellant had been found guilty of two counts of murdering a witness. However, the trial court could not have, and in fact did not, consider these convictions as aggravating circumstances in

80

> determining the appellant's punishment. Therefore, there is no indication in the trial court's sentencing order that the trial court improperly considered the two convictions in sentencing the appellant to death by electrocution. For the foregoing reasons, the appellant's argument is without merit."

> [*Hyde v. State*,] 778 So. 2d at [211]. It is clear that the jury was not overwhelmed by the number of charges pending against Boyd because it returned a sentence recommendation of life imprisonment without parole. Moreover, the trial court's sentencing order did not reflect that the number of convictions were treated as an aggravating circumstance. Boyd can suffer only one punishment in this case — he can be put to death only one time.

> Therefore, Boyd has not shown that counsel's performance was deficient or that he was prejudiced by counsel's performance. He has not shown that trial counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Nor has Boyd shown that there is a reasonable probability that, if trial counsel had made these objections in a different manner, the result of the trial would have been different.

*Boyd*, 746 So. 2d at 379-81.

Boyd now raises the same claim in this court. He argues that the state's act of "slicing up" his offenses into eight different counts subjected him to double jeopardy, and that his attorneys were ineffective for failing to properly challenge the multiplicitous indictment at trial or to raise the double jeopardy claim on direct appeal.

In deciding this claim on appeal from the denial of Boyd's Rule 32 petition, the Alabama Court of Criminal Appeals correctly identified the *Strickland* standard as

the appropriate standard of review for claims of ineffective assistance of counsel. *Boyd*, 746 So. 2d at 374-76, 381. By correctly identifying *Strickland* as the controlling legal standard for claims of ineffective assistance of counsel, the Alabama Court of Criminal Appeals did not reach a conclusion different from the United States Supreme Court on a question of law. Further, Boyd has not cited a decision in which the Supreme Court, faced with materially indistinguishable facts, reached a decision different from the state court in his case. Thus, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court.

Boyd argues, nevertheless, that the state court's decision was an unreasonable application of *Strickland*, because, if his attorneys had properly challenged "this overcounting," Boyd would have gone to trial on a smaller number of legally cognizable counts of murder. He claims that, if the indictment had contained a smaller number of counts, it is less likely the jury would have been "overwhelmed"; the jury might have been less likely to convict Boyd; and the jury might have recommended life without parole by a larger margin, which might have had an effect on the trial judge's final sentence. Petitioner's speculation on what might have been, if he had been charged with fewer counts of murder, has no impact on whether his attorneys were ineffective for failing to *prevail* on their objection to the indictment prior to trial. The fact remains that Boyd's convictions on eight counts were not

82

multiplicitous, because each count contained an element not contained in the others. The convictions did not subject Boyd to double jeopardy, because he did not receive a punishment greater than the legislature intended; he was not prosecuted a second time for an offense for which he had previously been acquitted; and, he cannot be punished by death more than once. The trial court's conclusion that counsel's performance was not deficient and did not prejudice petitioner, therefore, was not unreasonable, much less objectively unreasonable.

## 6. Failure to object to the prosecutor's racially discriminatory pattern of peremptory strikes (Claim H-4 in Petition)

Boyd alleges that trial counsel were ineffective for failing to object to the prosecutor's use of peremptory challenges against African American ("black") venire members. Specifically, he claims that the prosecution "used five of its peremptory strikes against the six black venire members remaining in the pool after cause challenges." Doc. 27 at 127. Boyd raised this claim during post-conviction proceedings, and the Alabama Court of Criminal Appeals made the following findings:

### I.D. and XII.

Boyd claims that the State exercised its peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), and that his counsel failed to object.

83

. . . .

Boyd contends that trial counsel did not object even though the state used five peremptory strikes to remove five of the six black veniremembers remaining in the pool after challenges for cause. According to Boyd, "the State of Alabama never provided race-neutral reasons for the striking of nearly all the African-Americans at Glenn Boyd's trial, and the court below did not require it to." (Appellant's brief at p. 59.)

Boyd is white. At the time of his March 1987 trial, *Powers*, which extended *Batson* to white defendants, had not been decided. "'We cannot say that counsel's performance was deficient for failing to forecast changes in the law.'" *Davis v. State*, 720 So. 2d 1006, 1019-20 (Ala. Cr. App. 1998) (*quoting Hallford v. State*, 629 So. 2d 6, 11 (Ala. Cr. App. 1992)). "[Boyd's] trial lawyers were not obliged to object based on possible future developments in the law in order to render effective assistance." *Thompson v. State*, 581 So. 2d 1216, 1236 (Ala. Cr. App. 1991) (citing *Knight v. Dugger*, 863 F.2d 705, 733 (11th Cir.1988); *Elledge v. Dugger*, 823 F.2d 1439, 1443 (11th Cir.), *modified on other grounds*, 833 F.2d 250 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S. Ct. 1487, 99 L. Ed. 2d 715 (1988); *Thompson v. Wainwright*, 787 F.2d 1447, 1459 n. 8 (11th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S. Ct. 1986, 95 L. Ed. 2d 825 (1987); and *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir.1985), *cert. denied*, 475 U.S. 1031, 106 S. Ct. 1242, 89 L. Ed. 2d 349 (1986)).

Therefore, Boyd has not shown that his counsel's performance was deficient or that he was prejudiced by his counsel's performance in this regard. *Strickland*, *supra*. He has not shown that trial counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Nor has Boyd shown that there is a reasonable probability that, if trial counsel had made this objection, the result of the trial would have been different.

*Boyd*, 746 So. 2d at 382.

Boyd again claims in this court that his attorneys were ineffective for failing to object to the state's peremptory strikes of five of the six blacks remaining in the jury pool after challenges for cause, and for failing to raise the issue on direct appeal. In deciding this claim on appeal from the denial of Boyd's Rule 32 petition, the state court correctly identified the *Strickland* standard as being the appropriate standard for reviewing ineffective assistance of counsel claims. *Boyd*, 746 So. 2d at 374-76, 382. By correctly identifying *Strickland* as the controlling legal standard, the Alabama Court of Criminal Appeals did not reach a conclusion different from the United States Supreme Court on a question of law. Moreover, Boyd has not cited a decision in which the Supreme Court, faced with materially indistinguishable facts, reached a decision different from the state court in his case. Thus, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court.

Boyd also argues that the state court's decision was an unreasonable application of *Strickland*. He contends that his attorneys should have objected to the elimination of blacks from the jury, even though the *Powers* case had not been decided by the date of his trial, because Alabama attorneys at the time were successfully challenging the use of peremptory strikes to eliminate black jurors in the trials of white defendants. The only case cited by Boyd in support of this contention is *Walker v. State*, 611 So. 2d 1133 (Ala. Crim. App. 1992). In *Walker*, the white

85

defendant argued on appeal that blacks had been unconstitutionally eliminated from

her jury. The Alabama Court of Criminal Appeals remanded the case to the trial court

for a finding of whether blacks were struck from the jury in violation of *Powers*.

*Walker v. State*, 586 So. 2d 49 (Ala. Crim. App. 1991). The decision in *Walker*,

however, was not handed down until July 26, 1991, *after* Boyd's conviction in 1987,

and after his appeal became final in 1989. Boyd has cited no authority to show that,

during the time of his trial and direct appeal, his attorneys should have had any reason

to raise a *Batson* objection on behalf of a white defendant. The state court thus was

not objectively unreasonable in concluding that counsel's failure to raise a *Batson*

claim on Boyd's behalf, prior to the decision in *Powers*, was not deficient and did not

prejudice Boyd.

## 7. Failure to adequately cross-examine and otherwise impeach the credibility of key state witnesses, including Robert Milstead, Kenny Surrett, and the state's forensic experts (Claim H-5 in Petition)

Boyd next claims that his attorneys were constitutionally ineffective for failing

to adequately cross-examine and otherwise impeach the credibility of key state

witnesses, including Robert Milstead,[41] Kenny Surrett,[42] and the state's forensics

experts. Boyd raised this claim during post-conviction proceedings, and the Alabama

---

[41] As stated in Part I of this opinion, Robert Milstead, Boyd's accomplice, testified that Boyd killed both Mr. and Mrs. Blackmon.

[42] As also stated in Part I, Kenny Surrett, Boyd's friend, testified that Boyd confided he had killed Mr. Blackmon.

86

Court of Criminal Appeals made the following findings:

I.G.

Boyd contends that trial counsel failed to adequately cross-examine and otherwise to impeach the credibility of key state witnesses, including Robert Milstead, Kenny Surrett, and the State's forensic experts. According to Boyd:

> "It was essential that Mr. Boyd's attorneys impeach the testimony of the state's main witness[es]. These included the forensic experts, who gave evidence regarding which wounds were caused by which firearms, what kind of wounds the victims suffered, and how long after the infliction of the wounds they died. Their testimony must have been used to support the trial court's finding of [the] heinous, atrocious or cruel aggravating factor, and was also used by the prosecutor to bolster his theory to the jury on how the murders occurred. Also critical was Kenny Surrett, who testified that petitioner told him about the killings. But probably the most important testimony to impeach was that of codefendant Robert Milstead who was the sole eyewitness to (and participant in) the killings and who testified that petitioner was responsible for them."

(Appellant's brief at p. 12.) According to Boyd: "Defense cross-examination of Kenny Surrett only served to *bolster* his allegations that petitioner had said that he personally had been involved in the killings." (Appellant's brief at p. 14.) (Emphasis in appellant's brief.)

We agree with the State that Boyd's contentions concerning Surrett are unclear. The claim consists of conclusory allegations unsupported by facts sufficient to show that Boyd is entitled to any relief. Therefore, regarding Surrett, Boyd has not met either the burden imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), Ala. R. Crim. P. It follows that Boyd has not shown that his counsel's performance was deficient or that he was prejudiced by his counsel's performance in this regard. *Strickland, supra.*

Boyd argues that trial counsel failed to obtain experts in ballistics, firearms, or pathology to challenge the testimony of State's witnesses.

According to Boyd:

"Examination of [State] experts Higgins, Embry and Scheuerman failed to expose the inconsistencies in their testimony and the failure of their data to support their conclusions about the manner and time of death and the wounds allegedly inflicted on the victims."

(Appellant's brief at p. 14.)

Boyd asserts that a pathologist could have testified that much of Robert Milstead's testimony against Boyd was a lie. Boyd states that a pathologist could have testified that Milstead's[]

"claim that Mrs. Blackmon's nose was 'driven through her skull' was pure, sick hyperbole. . . . They could have established that Mr. Blackmon could not have been beaten with a stick as Mr. Milstead averred and that there was no evidence of strangulation. . . . They would have shown that much of the disfigurement seen in Mrs. Blackmon's body likely occurred after she died and her body was buffeted about in a barrel. . . . They would also have shown that Mrs. Blackmon most likely died quickly as a result of gunshot wounds and that there was no evidence for either victim of a lingering death. . . . All of this would have been critically important to establishing that Mr. Milstead was a liar and that while terribly wrong and tragic, the deaths of the Blackmons were not the gruesome, 'heinous' spectacle the prosecution contended."

(Appellant's brief at p. 13.)

We do not agree with Boyd's assertion that testimony of a pathologist would have changed the outcome of the trial.[43]   The

---

[43] In a footnote located at this point in the textual quotation, the Alabama Court of Criminal Appeals quoted from that portion of its decision on direct appeal from Boyd's conviction setting

forth the pertinent portion of Milstead's trial testimony: *i.e.*,

"Milstead drove the car and Mr. Blackmon sat beside him in the front seat. The appellant and Mrs. Blackmon sat in the backseat. Milstead drove across the Coosa River to Ohatchee (in St. Clair County) and drove down a dirt road. At some point, the appellant, Milstead, and Mrs. Blackmon got out of the car and walked to a clearing behind a brush pile. The appellant then told Mrs. Blackmon to sit down. He tied her hands and feet, gagged and blindfolded her. After talking to Mrs. Blackmon, the appellant hit her on the nose with a stick and then hit her on the forehead. Mrs. Blackmon screamed and the appellant tried to choke her with a cloth. The appellant then took the .22 gun, muffled it with the cloth and shot Mrs. Blackmon. The shot did not kill her so the appellant took the .25 gun from Milstead and shot Mrs. Blackmon in the back and head. They covered Mrs. Blackmon's body up and left.

"Milstead and the appellant then took Mr. Blackmon back across the river (into Calhoun County) and parked on a dirt road. The appellant told Mr. Blackmon to get out of the car. The appellant hit Mr. Blackmon on the head with a stick. This hit broke the taillight on Mr. Blackmon's car. Then the appellant took a piece of cloth and started choking Mr. Blackmon. Mr. Blackmon struggled and stabbed the appellant with a stick. The appellant took out the .25 gun and put it to Mr. Blackmon's throat. Mr. Blackmon begged the appellant not to shoot him and said he could get $50,000 for him. The appellant told Mr. Blackmon it was too late and shot him in the chest and neck. Milstead and the appellant then put Mr. Blackmon's body in the trunk. Milstead and the appellant then drove Mr. Blackmon's car to the Piggly Wiggly grocery store lot and parked it there. They went to Milstead's father's house and washed up and changed clothes. Later that night, Milstead and the appellant went back and picked up Mr. Blackmon's car and drove it to a boat ramp on the Coosa River. The appellant rolled the windows of the car down and rolled the car down the ramp into the river. After a few minutes, the car sank. They threw the two pistols in a creek that night.

"The next morning, Milstead and the appellant went back to the place where they left Mrs. Blackmon's body. They were going to put her body in a barrel that Milstead bought the previous afternoon. The appellant said the body was too stiff and he took Milstead's ax and tried to cut Mrs. Blackmon's body in half. He then took the body and broke Mrs. Blackmon's back. The two then put her body into the barrel with some cement blocks and rocks. The appellant cut some holes in the barrel with the ax. Milstead and the appellant then rolled the barrel into the river and it sank.

"The appellant told Milstead to tell the police a story about the mafia if he was questioned concerning the Blackmons' deaths. He said that Milstead would wind

89

testimony given by the State's pathologist at trial essentially corroborated Milstead's version of the injuries sustained by the victims during the incident.

"Eugene Hunt Scheuerman testified that he was a medical examiner with the Department of Forensic Sciences in March of 1986. He stated that he was present when a black Cadillac Eldorado, tag number 11P-2864, was pulled from the Coosa River. The body of Fred Blackmon was removed from the trunk of this vehicle. Fred Blackmon was identified by the use of dental records.

"Scheuerman performed the autopsy on Fred Blackmon's body. Mr. Blackmon's clothing was soiled, muddy, and wet when it was removed from the trunk of the vehicle. There was a strip of white cloth on Mr. Blackmon's body which was used as a gag. Three holes were present on Mr. Blackmon's shirt. Two gunshot wounds were found on Mr. Blackmon's body. One of the gunshots penetrated the neck and passed into the chest cavity. The other gunshot penetrated the left side of the chest and passed through the heart. Both of these projectiles were recovered. The weapon which caused these gunshot wounds was fired at close range.

"Scheuerman also found minor blunt force injury to Mr. Blackmon's head. However, he determined Mr. Blackmon's cause of death to be the gunshot wounds to the chest and neck.

"Dr. Joseph Embry, a forensic pathologist with the

---

up like Mrs. Blackmon if he said anything to the police about him.

"Milstead testified that he had a conversation with Sharon Johnson on the day the murders occurred. Milstead told Johnson that he and the appellant kidnapped the Blackmons and that the appellant killed them."

*Boyd v. State*, 746 So. 2d at 385 n.9 (quoting *Boyd v. State*, 542 So. 2d 1247, 1253-1254 (Ala. Crim. App. 1988)).

90

Department of Forensic Sciences, testified that he was present
when a 55-gallon barrel was pulled from the Coosa River. The
body of Evelyn Blackmon was found inside the barrel. She was
identified through the use of head X-rays. Cinder blocks and
bricks were also found in this barrel.

"Embry performed the autopsy on Mrs. Blackmon's body.
There was a gag in Mrs. Blackmon's mouth and a piece of cloth
tied around her ankles. Mrs. Blackmon sustained three gunshot
wounds. One of the wounds was to the head and it was a
superficial wound. Another one of the wounds was to the right
side of the neck. The other wound was to the back. None of the
projectiles which caused these wounds was found in Mrs.
Blackmon's body.

"Mrs. Blackmon also sustained a laceration of her right
forehead. She had numerous fractures to her nose and face. Mrs.
Blackmon also had a chop wound in her lower back which
penetrated her backbone. Mrs. Blackmon's cause of death was
due to the two gunshot wounds to her neck and back."

*Boyd v. State*, 542 So. 2d 1247, 1249-50 (Ala. Cr. App. 1988).

Joseph Burton testified for the defense as an expert in forensic
pathology at Boyd's Rule 32 hearing. The essence of Burton's
testimony was that the victims sustained injuries that caused their deaths
but those injuries were not as gruesome as Milstead described. Burton
also testified that the absence of blood around the victims' wounds
(other than the fatal gunshot wounds) suggested that the wounds were
inflicted post-mortem. The intent of this testimony was to negate a
finding that the murders were especially heinous, atrocious, or cruel.
However, Burton conceded that the length of time that the victims'
bodies were underwater made designation of the wounds as anti- [sic]
or post-mortem inconclusive. (Vol.18, R 206.) Therefore, Burton's
testimony did not discredit the testimony of the State's pathologist.

Additionally, we note that the trial court found the murders to be

especially heinous, atrocious, and cruel not only because of the severe physical pain and suffering sustained by the victims prior to their death, but also because of the mental suffering inflicted before they were killed. Boyd came into the victims' home and told them he was going to kill their daughter (his ex-girlfriend), he robbed them, he kidnapped them at gunpoint, and he bound, gagged, and blindfolded them. He took them to a secluded area where they begged for their lives. Mrs. Blackmon was killed first and Mr. Blackmon continued to beg for his life. After disposing of the bodies in the river, Boyd bragged about the killings and about how cold-blooded he was. *Boyd v. State*, 542 So. 2d 1247, 1268 (Ala. Cr. App. 1988) (Appendix to the opinion). The absence of physical suffering by the victims could not mean that this crime was not especially heinous, atrocious, and cruel.

According to Boyd, a firearms or ballistics expert could have impeached Milstead's version of who shot the victims and could have made a "huge difference in confronting the evidence against Mr. Boyd for *both* aspects of the trial." (Appellant's brief at p. 13.) (Emphasis in appellant's brief.) According to Boyd, an expert would have shown that it was far more likely that both murders were committed with Milstead's gun. It was Milstead's testimony at trial that Boyd took Milstead's gun and shot the victims. *See Boyd v. State*, 542 So. 2d 1247, 1250 (Ala. Cr. App. 1988). The testimony of a ballistics expert would not resolve who pulled the trigger. Therefore, we fail to see how a ballistics expert could have impeached Milstead's testimony regarding who shot the victims.

Boyd has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), Ala. R. Crim. P. Therefore, Boyd has not shown that his counsel's performance was deficient or that he was prejudiced by his counsel's performance in this regard. *Strickland, supra*.

Regarding the impeachment of Milstead, Boyd contends:

"While forced to repeat only that he was saving himself from the electric chair, the defense could also have truly impeached the codefendant's testimony with this evidence. . . .

Indeed, the trial testimony itself was riddled with statements unsupported by and contradicted by the state's physical evidence; was internally inconsistent; and contradicted numerous elements of the statements previously given. Milstead changed his testimony about whether he had a gun . . .; whether he knew the victims . . .; what money was stolen and what happened to it. . . . He added commentary on the stand that had never been mentioned in any prior statement. . . . His testimony about how the victims were killed and where he allegedly was at the time was begging for impeachment. Moreover, had they adequately prepared, counsel could have challenged Milstead with the very contradictory and wholly inconsistent statements he had given the police prior to trial. The codefendant had given seven different statements. . . . These ranged from asserting no part in the murders, to claiming mere assistance, to describing petitioner's involvement with Fred Blackmon. These statements totally contradicted one another about what allegedly took place in the Blackmon residence and by the river.

"Trial counsel did not undertake such important cross-examination. Mr. Boyd's trial lawyer did little more than point out that the testimony and statement differed, period. . . . They did not expose to the jury the codefendant's lies on the stand. They did not elicit the key aspects in which the witness continually contradicted himself. The examination by the defense was rambling and did not convince the jury to reject what should have been proved to be the least credible evidence from the prosecution. . . .

"Defense counsel's failures to impeach the state's case prejudiced petitioner immeasurably. Had jury and judge been apprised of the weaknesses in the state's case, Mr. Boyd would not have been convicted of capital murder and sentenced to death."

(Appellant's brief at pp. 14-15.)(Footnote omitted.)

93

        We agree with the State's assessment that the record from the
direct appeal reflects that the jury knew that Milstead was testifying in
exchange for a sentence of life imprisonment without parole and it knew
that Milstead had given many different versions of the crime and had
admitted that some statements he had made were not true. Boyd's
allegation regarding Milstead ignores the cross-examination and the fact
that the jury was informed that Milstead gave different versions of the
crime and that he admitted that some of his statements to the police were
untrue. These statements were entered into evidence. Trial counsel
specifically attacked Milstead's credibility in closing arguments by
challenging the jurors to read Milstead's various statements and to
compare them to Boyd's statement to determine who was telling the
truth. Milstead's testimony was also impeached at trial by the testimony
of Sharon Johnson, Boyd's girlfriend, who testified that Milstead told
her that he had shot Mrs. Blackmon and that Boyd had shot Mr.
Blackmon. *Boyd v. State*, 542 So. 2d 1247, 1254 (Ala. Cr. App. 1988).
Moreover, Milstead was cross-examined concerning the physical
assaults on the victims. During closing arguments, trial counsel pointed
out that forensic evidence did not support Milstead's testimony, in
particular his horrible testimony about the alleged use of an axe on Mrs.
Blackmon's body.

        Boyd has not shown that his counsel's performance was deficient
or that he was prejudiced by his counsel's performance in this regard.
*Strickland, supra*.

*Boyd v. State*, 746 So. 2d at 384-88.

        As he did in state court, Boyd brings to this court the claim that his attorneys

were ineffective for failing to adequately cross-examine and otherwise impeach the

credibility of key state witnesses. Boyd claims that the testimony of the forensic

experts should have been impeached because it "must have been used to support the

trial court's finding of the heinous or cruel aggravating factor, and was also used by

                                    94

the prosecutor to bolster his theory to the jury on how the murders occurred." Doc.
no. 27, at 75-76. He contends that Kenny Surrett's testimony that Boyd told him
about the killings should have been impeached; and that, most importantly,
Milstead's testimony should have been impeached because Milstead — the co-
defendant and sole eyewitness to the murders — testified that Boyd was responsible
for killing both of the Blackmons.

In deciding this claim on appeal from the denial of Boyd's Rule 32 petition, the
state court correctly identified the *Strickland* standard as the appropriate standard of
review for claims of ineffective assistance of counsel. *Boyd*, 746 So. 2d at 374-76,
387-88. Thus, the court applied the correct legal rule. By correctly identifying
*Strickland* as the controlling legal standard, the Alabama Court of Criminal Appeals
did not reach a conclusion different from the United States Supreme Court on a
question of law. Furthermore, Boyd has not cited a decision in which the United
States Supreme Court, faced with materially indistinguishable facts, reached a
decision different from the state court in his case. Thus, the state court's decision was
not "contrary to" clearly established federal law as determined by the Supreme Court.

Boyd next argues that the state court's decision was an unreasonable
application of *Strickland*. He claims that the "state court improperly found that the
trial court would have found the heinousness aggravator even with proper cross-

95

examination of Milstead and the state's experts." Doc. 27 at 79. He contends that most of the "basis of the aggravator" was discredited, and that the mental suffering the victims purportedly endured could have been disproved, if only Milstead had been discredited. Boyd adds that Carl Majesky's testimony contradicts Milstead's testimony as to which co-defendant possessed which gun. Boyd maintains that, if his attorneys had adequately impeached the testimony of these witnesses, the jury would have entertained reasonable doubts about his guilt, the sentencer would have had more than reasonable doubts about the existence of aggravating circumstances, and the trial court would have been made aware of the extent to which Milstead would lie to save his own life.

The Court of Appeals correctly found that: Milstead's testimony regarding how Boyd murdered Mr. Blackmon was supported by the testimony of the pathologist who performed the autopsy, *Boyd*, 746 So. 2d at 386; that the trial testimony of the pathologists was corroborated by Milstead's testimony, *id*. at 385; that Dr. Burton's testimony did not discredit the testimony of the state's pathologist, *id*. at 387; that the finding of heinous, atrocious, or cruel aggravating circumstances was supported by the *mental* suffering the victims endured, *id*. at 387; and that counsel's performance with regard to the cross-examination of Milstead was not deficient and did not

prejudice the petitioner. *Id.* at 388.[44] Boyd has presented to this court only conclusory arguments that these findings were unreasonable. There is nothing to indicate that the state court was objectively unreasonable in its conclusions that Boyd's attorneys were effective in their cross-examination and impeachment of the witnesses, and that Boyd was not prejudiced by their actions.

Boyd, nevertheless, argues that the decision of the Alabama Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Specifically, he claims that the post-conviction testimony of Georgia Medical Examiner Joseph Burton discredited the testimony of the state's trial witness. He asserts that Dr. Burton's testimony was not that "'the wounds were not as severe or gruesome as described by Milstead,' and it was not 'corroborating,'" and that his testimony would have shown that it was

---

[44] Milstead gave seven statements to the police and was cross-examined about each statement. R 822-25. Each of his statements was admitted into evidence at trial. CR 286-368. During closing arguments, Boyd's attorneys attacked Milstead's credibility for giving different versions of the crime. R 895. Milstead even admitted that some of his statements were not true. R 767, 822-23, 842. Milstead testified at trial that he had pled guilty to four counts of capital murder with the understanding that, in exchange for his pleas, he would receive a sentence of life without parole. R 767, 798. Milstead's testimony was also challenged by the testimony of Boyd's girlfriend, Sharon Johnson, who testified that at the time of the crime, Milstead told her that he shot Mrs. Blackmon and Boyd shot Mr. Blackmon. *Boyd*, 542 So. 2d at 1254. Milstead was cross-examined at trial about Sharon Johnson's testimony that he said he shot Mrs. Blackmon. R 803-05. Milstead was cross-examined concerning his testimony about the physical assaults on the Blackmons, specifically the use of an ax on Mrs. Blackmon's body. R 814. During closing argument, counsel argued that the forensic evidence did not support some of Milstead's testimony, pointing out the areas of his testimony not supported by physical evidence. R 895-96.

medically impossible for the events to have transpired as Milstead said they had. Other than his conclusory assertions in this regard, Boyd had offered nothing to support his claim that the decision of the Alabama Court of Criminal Appeals was based on an unreasonable determination of the facts.

## 8. Failure to devise a strategy for saving Boyd from a capital murder conviction (Claim H-6 in Petition)

Boyd next claims that his attorneys had no strategy for saving him from a capital murder conviction. Specifically, he contends that: (1) pretrial preparation was minimal, and that it was conducted largely by a lawyer who had never tried a capital case; (2) counsel were unprepared for Robert Milstead to take the stand; (3) counsel were unprepared for the penalty phase before the jury; (4) counsel were unprepared to challenge the state's case before the sentencing court; (5) counsel failed to object adequately to their lack of resources and compensation; (6) counsel did not effectively cross-examine witnesses, move to suppress evidence, or object to improper evidence (such as testimony about other crimes or an inadmissible presentence report); (7) counsel failed to object at numerous points during the trial when an objection was required; (8) counsel presented no defense; (9) counsel failed to effectively impeach the testimony of Robert Milstead and Kenny Surrett; (10) counsel did not challenge the state experts' forensic evidence; (11) counsel did not

98

raise the fact that the evidence failed to support the pathologist's conclusions concerning the victims' injuries; (12) counsel failed to object to the prosecution's mischaracterizations of the evidence in closing arguments; (13) counsel made ineffective closing arguments that worked more to bolster the prosecution's case than to exonerate Boyd; (14) counsel did little to persuade the trial judge not to override the jury's verdict; (15) counsel neglected to object to improper verdict forms, or the court's failure to charge on lesser included offenses and other instructions; and (16) counsel inadequately challenged the trial court's failure to re-instruct the jury on the difference between capital murder and murder.

Boyd raised these same contentions during post-conviction proceedings, and the Alabama Court of Criminal Appeals entered the following findings:

I.S.

Boyd contends that trial counsel failed to properly prepare, investigate or pursue an effective defense on his behalf. . . . [T]his claim consists of a list of the "plethora of errors regarding the presentation of the defense case individually and collectively [that] denied Mr. Boyd the effective assistance of trial counsel." (Appellant's brief at p. 31.)

"This 'grocery list' of counsel's alleged failures is totally useless because it represents only legal conclusions unsupported by specific facts. . . . 'A petition is "meritorious on its face" only if it contains a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a general statement concerning the nature and effect of those facts) sufficient to show that the petitioner is entitled to relief if those facts are true.'"

99