**FILED**

2004 Dec-07  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

20.   **Counsel's lack of sufficient time to make strategic decisions or properly represent the petitioner** (Claim Z in Petition)

Boyd claims that his attorneys' ability to select a jury, defend him, and prepare for sentencing were compromised by the trial court's insistence on "rush[ing] this case along." Doc. no. 27, at 143. He contends that his attorneys were not able to make an informed decisions as to whether he should testify, because the trial court refused to recess the trial until the following morning; because defense counsel were not allowed extra time to reformulate a strategy after Milstead suddenly pled guilty; and because his attorneys were not allowed a continuance until the next day to prepare for the penalty phase. When Boyd raised these related claims on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that they were procedurally barred, "because they could have been, but were not, raised and addressed at trial and on direct appeal. Rules 32.2(a)(3), and (5), Ala. R. Crim. P." *Boyd*, 746 So. 2d at 404. The appellate court's decision rests upon procedural rules that are adequate and independent grounds for denying relief under state law and, thus, the claims will not be reviewed here. Boyd argues the procedural default should be excused due to the ineffectiveness of his attorneys, but this court determined that the ineffective assistance claim attached to this issue (raised as part of Claim I in Petition) is without merit.

**21.    State's failure to prove all elements of the offense** (Claim AA in Petition)

Boyd contends that the state failed to prove that he kidnapped the Blackmons with the intent to terrorize them. When Boyd raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the claim was procedurally barred, "because [it] could have been, but w[as] not, raised and addressed at trial and on direct appeal. Rules 32.2(a)(3), and (5), Ala. R. Crim. P." *Boyd*, 746 So. 2d at 404. The appellate court's decision rests upon procedural rules that are adequate and independent grounds for denying relief under state law. Thus, the claim is barred from review here.

**22.    Denial of impartial jury** (Claim DD in Petition)

Boyd alleges that he was deprived of an impartial jury by the failure of the trial court to grant his challenges for cause during jury selection. He states that two jurors expressed a belief in his guilt and suggested that he should bear the burden of proving his innocence. When Boyd raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the claim was procedurally barred "because [it] could have been, but [was] not, raised on direct appeal. Rule 32.2(a)(5), Ala. R. Crim. P." *Boyd*, 746 So. 2d at 404.

The appellate court's decision rests upon procedural rules that are adequate and independent grounds for denying relief under state law. Thus, the claim is barred

170

from review here. There is no cause to excuse default on the basis of ineffective assistance of counsel since this court determined the ineffective assistance claim attached to this issue (raised as part of Claim I in Petition) is without merit.

## 23. Admission of Boyd's statements (Claim EE in Petition)

Boyd contends that his statements to police, in which he admitted to being a participant in the abduction and murder of the Blackmons, should not have been used against him because they were involuntarily made after he was threatened with electrocution, after he was given false and misleading information by his interrogators, and after he asked to speak to an attorney. When Boyd raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the claim was procedurally barred, "because [it was] raised and addressed at trial and could have been, but [was] not, raised on direct appeal. Rule 32.2(a)(2) and (a)(5), Ala. R. Crim. P." *Boyd*, 746 So. 2d at 404-05. The court's decision rests upon procedural rules that are adequate and independent grounds for denying relief under state law. Thus, the claim is barred from review in this court. There is no cause to excuse default on the basis of ineffective assistance of counsel since this court determined the ineffective assistance claim attached to this issue (raised as part of Claim I in Petition) is without merit.

171

**24.    Failure of Alabama death penalty statute to provide meaningful, comparative review** (Claim HH in Petition)

Boyd claims that the Alabama death penalty statute is unconstitutional because it fails to provide meaningful, comparative review for those under a sentence of death. When Boyd raised this claim on appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the claim was procedurally barred, "because [it] could have been, but w[as] not, raised and addressed at trial and on direct appeal. Rules 32.2(a)(3), and (5), Ala. R. Crim. P." *Boyd*, 746 So. 2d at 404.

The appellate court's decision rests upon procedural rules that are adequate and independent grounds for denying relief under state law. Thus, the claim is barred from review in this court. There is no cause to excuse the default on the basis of ineffective assistance of counsel, because this court previously determined the ineffective assistance claim attached to the issue (raised in Claim H-16 and as part of Claim I in Petition) is without merit.

**E.    Remaining Claims**

**1.    Distinction between murder and capital murder** (Claim J in Petition)

Boyd claims that the trial court's failure to explain the "distinction between murder and capital murder" when the jury sought an explanation during deliberations deprived him of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The State of Alabama acknowledges that this claim is subject to review under 28 U.S.C. § 2254(d), because the state appellate courts addressed the issue on the merits on direct appeal. *See Boyd*, 542 So. 2d 1247, 1258-59 (Ala. Crim. App. 1988); *Ex Parte Boyd*, 542 So. 2d 1276, 1283 n.9 (Ala. 1989).[60] The Alabama Court of Criminal Appeals initially held that the claim was procedurally defaulted, but nevertheless proceeded to review the claim on its merits. The Alabama Supreme Court then addressed the claim on the merits. Under the plain statement rule, a federal district court may consider a claim "when a state court's decision created an ambiguity over whether the decision was based on the merits or on the application of a procedural bar." *Morrison v. Thigpen*, No. 90-D-1103-N, 1995 WL 914616, at *6 (M.D. Ala. Jan. 19, 1995) (citing *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)).

The Alabama Court of Criminal Appeals did "not find the trial judge's refusal to give additional instructions to the jury on murder and capital murder to be error, since the trial judge thoroughly instructed the jury on these matters in his oral charge to them." *Boyd*, 542 So. 2d 1259. The Alabama Supreme Court, in assuming, but not deciding that the issue was properly before it, found that "the action of the trial court [was] not error inasmuch as the jury was fully instructed on the matters at issue." *Ex*

---

[60] However, the respondents also argue in a later section of their brief that the claim is procedurally defaulted. Doc. no. 20, at 114.

*Parte Boyd*, 542 So. 2d at 1283 n.9. Neither court cited any precedent as support for its conclusion that the trial court did not err in failing to reinstruct the jury on the difference between capital and non-capital murder. Even so, the conclusions were correct.

Rule 22.2 of the Alabama Rules of Criminal Procedure governs additional instructions to a jury after deliberations have begun, and it reads, in pertinent part, as follows:

> After the jurors have retired to consider their verdict, if they request to have any testimony repeated, or if they or any party requests additional instructions, the court *may* recall the jurors to the courtroom and order the testimony read or give appropriate additional instructions. The court *may* also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony *may* be read or such instructions given only after notice to the parties. [Emphasis supplied.]

"This rule is permissive, rather than mandatory[,] as evidenced by the use of the word 'may.'" *Grayson v. State*, 675 So. 2d 516, 523 (Ala. Crim. App. 1995) (quoting *Jackson v. State*, 581 So. 2d 553, 559 (Ala. Crim. App. 1991)).

Boyd argues that a trial judge is required to clear up jury confusion, and cites as support for this assertion *Bollenbach v. United States*, 326 U.S. 607, 66 S. Ct. 402, 90 L. Ed. 350 (1945), *United States v. Warren*, 984 F.2d 325 (9th Cir. 1993), and *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989). In *Warren*, the jury asked, "[i]s premeditated to 'hurt' the same as premeditated to 'kill'?" *Warren*, 984 F.2d at

174

329. In response, the trial judge merely referred the jury to a particular portion of the charge he previously had given. The Ninth Circuit reversed on the ground that the instruction to which the court referred the jury did not answer the jurors' question: "[t]he court's original instruction focused on the nature of 'premeditation' rather than upon what must be premeditated to establish first degree murder." *Id.* at 330. Therefore, "referring the jury back to the original instruction would not correct the apparent impression of at least some jurors that intent 'to hurt' rather than 'to kill' might be sufficient to convict Warren of first degree murder." *Id.*

In *Newlon*, "[d]uring penalty phase deliberations, the jury asked the court to define the phrase [depravity of mind], but the court advised the jury that it could not give them further instructions." *Newlon,* 885 F.2d at 1334. The Eighth Circuit held that the trial court's refusal to clarify the concept "left the jury free to administer the statute 'in an arbitrary and unpredictable fashion.'" *Id.* at 1334. The trial court's refusal to further instruct the jury was not error *per se*, however. Rather, error lay in the fact that the trial court's original explanation of the concept of "depravity of mind" was inadequate.[61]

The defects in the instructions involved in these cases are quite different from the instructions given in Boyd's case. At the conclusion of the guilt-innocence phase

---

[61] The problem in *Bollenbach* was that the judge's supplemental instruction following an inquiry from the jury was "palpably erroneous." 326 U.S. at 611, 665 S. Ct. at 404-05.

of this case, the trial judge gave thorough, clear instructions on both capital murder, murder, and lesser included offenses. R 911-41. The trial judge repeatedly instructed the jury about the element of intent, and the necessity of finding an intentional killing in order to support a verdict of capital murder. Because the petitioner's jury was adequately instructed on murder and capital murder, it was unnecessary for the trial court to provide the jury additional instruction. The Constitution requires nothing further of the trial court. *See Weeks v. Angelone*, 528 U.S. 225, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). This claim is without merit.

## 2. Death by electrocution amounts to cruel and unusual punishment
(Claim K in Petition)

Boyd claims that death by electrocution constitutes cruel and unusual punishment because it inflicts unnecessary pain and torment upon the condemned inmate. The Alabama Legislature recently amended the statute defining the time, place, and method of executions in the State, and added a new provision reading as follows: "A death sentence shall be executed *by lethal injection*, *unless* the person sentenced to death *affirmatively elects* to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82." Ala. Code § 15-18-82.1(a) (1975) (Supp. 2004) (emphasis supplied). The new method of execution in Alabama became effective on July 1, 2002, and applied retrospectively to all inmates then on death row for capital murder convictions, including petitioner. *See id*., § 15-18-82.1(d).

Accordingly, Boyd's claim is denied as moot.

**3.     State's failure to prove all elements of the offense** (Claim AA in Petition)

Boyd claims that the state failed to meet its burden of proving both that a robbery was committed, and that he had the requisite, specific intent to kill. He raised both of these claims on appeal from the denial of his Rule 32 petition. Tab P-54 at 90-91. However, the Alabama Court of Criminal Appeals did not address either claim. Federal courts play a limited role in weighing the constitutional sufficiency of evidence in state criminal prosecutions. *See Martin v. Alabama*, 730 F.2d 721, 724 (11th Cir. 1984). The sole question to be determined when a state prisoner seeks federal habeas relief on the ground that the evidence supporting his conviction was insufficient is "whether, after viewing the evidence in the light most favorable to the [state], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. White*, 815 F.2d 1401, 1403 (11th Cir. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). "The [state's] proof need not rule out *every* theory except guilt beyond a reasonable doubt." *Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990).

When presented with conflicting testimony, a federal habeas court must presume that the trier of fact resolved the conflict in favor of the prosecution and against the defendant. *Machin v. Wainwright*, 758 F.2d 1431, 1435 (11th Cir. 1985).

177

In other words, federal courts must defer to the judgment of the jury in assessing the

credibility of witnesses and the weight of evidence. *See Jackson*, 443 U.S. at 326, 99

S. Ct. at 2792-93; *Wilcox v. Ford*, 813 F.2d 1140, 1146 (11th Cir. 1987). This

analysis requires an assessment of the essential elements under Alabama law of the

crimes for which Boyd was convicted. Counts V, VI, VII, and VIII of the indictment

charged him with murder during a robbery in the first degree. (See **Appendix I** to

this opinion.) Alabama Code § 13A-8-41(a) provides that:

> A person commits the crime of robbery in the first degree if he
> violates § 13A-8-43, and he:
>
> > (1) Is armed with a deadly weapon or dangerous
> > instrument; or
> >
> > (2) Causes serious physical injury to another

Alabama Code § 13A-8-43(a) provides that:

> A person commits the crime of robbery in the third degree if in the
> course of committing a theft he:
>
> > (1) Uses force against the person of the owner or any person
> > present with intent to overcome his physical resistance or physical
> > power of resistance; or
> >
> > (2) Threatens the imminent use of force against the person of the
> > owner or any person present with intent to compel acquiescence
> > to the taking of or escaping with the property.

Alabama Code § 13A-8-2 provides that:

> A person commits the crime of theft of property if he:

178

(1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property; or

(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property.

In order to sustain the first degree robbery portion of Boyd's convictions, there must be sufficient evidence from which the jury could have found beyond a reasonable doubt that Boyd committed a theft, by knowingly obtaining or exerting unauthorized control over the property of another, with intent to deprive the owner of his property, and that he:

1) used force against the Blackmons with intent to overcome their physical resistance or physical power or resistance; and,

2) was armed with a deadly weapon (Counts V and VI); or

3) caused serious physical injury to the Blackmons (Counts VII and VIII).

A review of the trial record, particularly the testimony of Robert Milstead and the statements of petitioner, makes it clear that there was abundant evidence to support findings that Boyd exercised unauthorized control over the Blackmons' automobile and money, with the intent to deprive them of such property; that he used force against the Blackmons, with the intent to overcome their physical resistance; that he was armed with a deadly weapon; and that he and his accomplice caused serious physical injury, and ultimately death, to both of the Blackmons. Therefore, the

179

evidence was sufficient to allow a rational trier of fact to find that Boyd was guilty, beyond a reasonable doubt, of first degree robbery.

Each of the counts of capital murder with which Boyd was charged required a finding that he intended to kill the victims. Again, the trial record, and particularly the testimony of Milstead and petitioner's own statements, unquestionably establishes that there was abundant evidence of Boyd's intent to kill the Blackmons. This evidence was more than sufficient to authorize a rational trier of fact to find that Boyd was guilty, beyond a reasonable doubt, of intentionally killing at least Mr. Blackmon.

**4.     Use of evidence illegally seized from Boyd's automobile** (Claim GG in Petition)

Boyd claims that his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated by the use of various items illegally seized from his automobile. Specifically, he objects to the use of a bag containing clothing worn by him and Robert Milstead during the commission of the crimes, pieces of cloth that matched those used to blindfold and gag the victims, and a necklace belonging to Evelyn Blackmon. Boyd raised this claim at trial and on direct appeal. On *certiorari* review, the Alabama Supreme Court held that the evidence obtained during the search of Boyd's automobile was admissible, because the officers had probable cause to believe that evidence of the crime was in his car.

II.

180

The final issue to be reviewed concerns the finding by the Court of Criminal Appeals that the police had probable cause to search Boyd's car. Specifically, that court held that "[t]he police had probable cause to believe that the appellant's vehicle had been used in the commission of the crimes." What we find in the record is that 1) Lieutenant Carroll learned from Boyd shortly after the arrest that the clothes worn by Boyd and Milstead on the date of the crimes were on the front seat of Boyd's Camaro, and that 2) Sergeant Watson and Officer Bradley conducted an "inventory by request of Lieutenant Carroll."

It is a "well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause." *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984); *see also United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985), *cert. denied*, 474 U.S. 849, 106 S. Ct. 144, 88 L. Ed. 2d 119 (1985); *United States v. Balsamo*, 468 F. Supp. 1363 (D. Me. 1979). "[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of . . . searching may be far less informed." *United States v. Hawkins*, 595 F.2d 751, 752-53 n.2 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 910, 99 S. Ct. 2005, 60 L. Ed. 2d 380 (1979) (citing *Smith v. United States*, 358 F.2d 833, 835 (D.C. Cir. 1966), *cert. denied*, 386 U.S. 1008, 87 S. Ct. 1350, 18 L. Ed. 2d 448 (1967), and *Williams v. United States*, 308 F.2d 326, 327 (D.C. Cir. 1962)). In the instant case, Lieutenant Carroll had probable cause to search Boyd's vehicle, and Sergeant Watson and Officer Bradley acted pursuant to his directive. Therefore, the police had probable cause, based on their collective information, to search Boyd's vehicle.

In [*South Dakota v.* ] *Opperman*, [428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976)], the Supreme Court recounted the rationale that generally excuses the warrant requirement of the Fourth Amendment to the federal constitution when police officers have probable cause to search an automobile:

> This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth

Amendment. Although automobiles are 'effects' and thus within the reach of the Fourth Amendment, *Cady v. Dombrowski*, 413 U.S. 433, 439[, 93 S. Ct. 2523, 2527, 37 L. Ed. 2d 706] (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. *Cardwell v. Lewis*, 417 U.S. 583, 589[, 94 S. Ct. 2464, 2468, 41 L. Ed. 2d 325] (1974); *Cady v. Dombrowski, supra*, [413 U.S.] at 439-440[, 93 S. Ct. at 2527]; *Chambers v. Maroney*, 399 U.S. 42, 48[, 90 S. Ct. 1975, 1979, 26 L. Ed. 2d 419] (1970).

The reason for this well-settled distinction is twofold. First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. *Carroll v. United States*, 267 U.S. 132, 153-154[, 45 S. Ct. 280, 285, 69 L. Ed. 543] (1925); *Coolidge v. New Hampshire*, 403 U.S. 443, 459-460 [, 91 S. Ct. 2022, 2034, 29 L. Ed. 2d 564] (1971). But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. *Chambers v. Maroney, supra*, [399 U.S.] at 51-52 [, 90 S. Ct. at 1981]; *Cooper v. California*, 386 U.S. 58 [, 87 S. Ct. 788, 17 L. Ed. 2d 730] (1967). Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. *Cady v. Dombrowski, supra*, [413 U.S.] at 442[, 93 S. Ct. at 2528]. Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

182

The expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel. Only two Terms ago, the Court noted:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.... It travels public thoroughfares where both its occupants and its contents are in plain view.

*Cardwell v. Lewis, supra*, [417 U.S.] at 590[, 94 S. Ct. at 2469].

*Opperman*, 428 U.S. at 367-68, 96 S. Ct. at 3096 (footnote omitted). In the case at bar, the warrant requirement is therefore excused.

The four-day delay between the impoundment and the search is not unreasonable due merely to the passage of time. *United States v. Johns*, 469 U.S. 478, 105 S. Ct. 881, 83 L. Ed. 2d 890 (1985), illustrates this point quite well. In *Johns*, law enforcement officers arrested several persons at a remote Arizona airstrip. Prior to the arrest, the law enforcement officers had watched the arrestees maneuver their trucks up to a small airplane that had landed. At the time of the arrest, the officers smelled the odor of marijuana coming from the trucks and saw in the trucks several packages that were wrapped and sealed in a manner that to the officers resembled the manner in which smuggled marijuana is packaged. The officers had probable cause to search the trucks at the airstrip, but, instead, took them to the Drug Enforcement Agency headquarters and, without a warrant, searched them and containers found within them three days later. Borrowing from *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982), the Court in *Johns* recounted that "'an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband'" (*quoting Ross*, 456 U.S. at 823, 102 S. Ct. at 2172) and that "'if probable cause justified the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search'" (*quoting Ross*, 456 U.S. at 825, 102 S. Ct. at 2173). *Johns*, 469

183

U.S. at 484, 105 S. Ct. at 885. With this predicate, the contention that the three-day delay between the impoundment and the warrantless vehicle search made the search unreasonable was promptly dismissed. "[W]here police officers are entitled to seize the container and continue to have probable cause to believe that it contains contraband, we do not think that the execution of the warrantless [vehicle] search is necessarily unreasonable." *Johns*, 469 U.S. at 487, 105 S. Ct. at 886. That Court added one caveat, which we find to be inapplicable here because Boyd offered no proof that any privacy interest was adversely affected:

> We do not suggest that police officers may indefinitely retain possession of a vehicle and its contents before they complete a vehicle search. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 523, 91 S. Ct. 2022, 2066, 29 L. Ed. 2d 564 (1971) (WHITE, J., dissenting). Nor do we foreclose the possibility that the owner of a vehicle or its contents might attempt to prove that delay in the completion of a vehicle search was unreasonable because it adversely affected a privacy or possessory interest. *Cf. United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983).

*Id.*

Based on our reading of *Johns*, we conclude that, because the officers of the Anniston Police Department did in fact have probable cause to search Boyd's vehicle at the time it was impounded, and because that probable cause continued throughout the four days between the impoundment and the search, the warrant requirement of the Fourth Amendment was excused. We are fully cognizant that "[t]he fourth amendment provides the minimum threshold of privacy protection in the United States. States can provide their citizens with additional rights supplementing those rights afforded by the federal constitution." *Comment, Colorado v. Bertine Opens the Inventory Search to Containers*, 73 Iowa L. Rev. 771, 793 (1988). Because the search was proper under the "vehicle search" exception to the warrant requirement of the Fourth Amendment of the federal constitution and under article I, § 5, of the State constitution, the evidence obtained during that search was properly admissible against Boyd at trial.

III.

In summary, we hold that the evidence obtained from Boyd's vehicle was admissible, because the officers of the Anniston Police Department who conducted the search had probable cause to believe that evidence of the fruits or instrumentalities of Boyd's crimes were in his car. This we hold despite our conclusion that the search can not be upheld as a valid inventory.

*Ex parte Boyd*, 542 So. 2d 1276, 1283-86 (Ala. 1989) (footnote omitted).

When deciding Boyd's Fourth Amendment claim on direct appeal, the Alabama Supreme Court correctly identified the United States Supreme Court's opinions in *Opperman* and *Johns* as supplying the appropriate standards for reviewing claims based upon a delayed, warrantless search of a motor vehicle. *Id.* at 1283-84. Thus, the court applied the correct legal rule in deciding Boyd's claim, and did not reach a conclusion different from the Supreme Court on a question of law. Boyd has not cited a decision in which the United States Supreme Court, faced with materially indistinguishable facts, reached a conclusion different from the state court in his case. Thus, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court.

Boyd nevertheless argues that the state supreme court's decision was an unreasonable application of *Johns*, because the court "expanded the vehicle exception to the warrant requirement of the Fourth Amendment to permit police officers to search a vehicle about which they had no criminal suspicions whatsoever." Doc. no.

27, at 150. That is not correct. Both the Alabama Court of Criminal Appeals and the Alabama Supreme Court found that the police had probable cause to believe that Boyd's automobile contained evidence relevant to the crimes. At approximately 8:40 a.m. on March 26, 1986, the morning the Blackmons disappeared, Officer Ken Murphy of the Anniston Police Department noticed a white Chevrolet Camaro, Alabama tag number 11K9970, illegally parked on Fairway Heights, approximately one-quarter to a half mile from the Blackmons' home. R 385. The Camaro was registered to Boyd. R 397.

On April 3, 1986, just hours before Boyd was arrested, his co-defendant Robert Milstead gave a detailed statement to the police. R 478, CR 287-306.[62] In that statement, Milstead described his own, and Boyd's, involvement in the kidnapping and murder of the Blackmons. He stated that he had spent the night with Boyd and Boyd's mother on March 25, 1986. CR 288. On the morning of March 26, 1986, he and Boyd departed Boyd's home at about 7:50 a.m., in Boyd's 1976 white Camaro, to take Boyd's mother to work. CR 288-89. After dropping her off, Milstead and Boyd "rode around" until about 8:30 a.m. CR 289. They parked Boyd's Camaro about three blocks from the Blackmon home, then walked to the house to carry out Boyd's plan to "blackmail Evelyn so that he could see Julie again." CR 289. Boyd

---

[62] Milstead's statement was taken at 12:15 p.m. on April 3, 1986. CR 286. Boyd was arrested at 3:25 p.m. on April 3, 1986. R 462.

had a small black revolver with him when the they entered the Blackmons' house. CR 292. Milstead stated that he waited at the Blackmon home with Evelyn while Boyd drove with Fred Blackmon, in Fred's automobile, to the bank. CR 293-94. After they returned, Milstead and Boyd then drove the Blackmons away in the Blackmons' automobile. CR 296. Milstead drove them to a secluded area where Boyd and Evelyn got out. CR 298. Boyd returned to the car, without Evelyn, and told Milstead to drive away. CR 299. A while later, at Boyd's direction, Milstead got out of the car, and waited while Boyd drove away with Fred. CR 299. Boyd returned in the car, without Fred, to pick up Milstead. CR 299-300. Boyd took Milstead back to Boyd's car, then Milstead followed Boyd, who was still driving the Blackmons' car, to Piggly Wiggly. CR 300. Boyd left the Blackmons' Cadillac at Piggly Wiggly and got into the Camaro with Milstead. CR 300. They went to Boyd's house, and Boyd changed clothes. CR 300. Later that day, Milstead took the Camaro to his house, where he left it, borrowed his father's truck, and drove to the Army Surplus Store, where he purchased two fifty-five gallon barrels. CR 300-01. Milstead then drove back to his home, where he returned his father's truck, left one barrel, loaded the other into the Camaro's trunk, and drove back to Boyd's house. CR 301. While Milstead was buying the barrels, Boyd had purchased a pick-up truck. CR 302. Boyd and Milstead then took the barrel in Boyd's new pick-up truck to Piggly Wiggly,

187

where Boyd retrieved the Blackmons' Cadillac. CR 302. The two men drove to a boat ramp, Boyd in the Cadillac and Milstead in Boyd's new truck. CR 302. Boyd sank the Cadillac in the water, then they returned home for a barbecue. CR 302.

The confession of a co-defendant is sufficient to serve as the basis for probable cause. *Craig v. Singletary*, 127 F.3d 1030, 1045 (11th Cir. 1997) (*en banc*); *see also United States v. Patterson*, 150 F.3d 382, 386 (4th Cir. 1998) (accomplice's statement sufficient to provide probable cause to search the defendant's automobile). "[E]ven when a co-defendant's confession seeks to shift some of the blame to another, the co-defendant's admission of guilt to the core crime is enough indication of 'reasonably trustworthy information' to satisfy probable cause." *Craig*, 150 F.3d at 1045. Here, Boyd's co-defendant and accomplice confessed to complicity in the crime, although he implicated Boyd more than himself. It was clear from Milstead's statement that Boyd's Camaro was used by the two men for transportation to the Blackmons' house, and then again after they left the Blackmons in isolated locations. Thus, there was probable cause to seize Boyd's Camaro based on Milstead's statement.[63] The court finds that the Alabama Supreme Court's findings on this claim were not objectively unreasonable.[64]

---

[63] Additionally, Officer Murphy had seen Boyd's car parked in the vicinity of the Blackmons' house on the day they disappeared.

[64] The petitioner also contends that it was error for the Alabama Supreme Court to raise the issue of probable cause *sua sponte*, precluding him from establishing critical facts by the state court's

188

Moreover, the court finds that, even if the police officers lacked probable cause

to search Boyd's Camaro four days after it was impounded, the admission into

evidence of items seized from the car was harmless error. Even without the evidence

found in the automobile, there was overwhelming evidence of Boyd's guilt. Boyd

himself had confessed to his involvement in the kidnapping and murder of the

Blackmons. CR 234-51. Boyd's car was seen just a few blocks from the Blackmons'

home on the morning of their disappearance. R 385. Boyd's accomplice testified at

trial, clearly implicating Boyd and himself in the murders. R 766-843. Boyd's friend,

Kenny Surrett, testified that, on the night of March 25, 1986, the evening before the

Blackmons disappeared, he saw Boyd in possession of a chrome or silver .25 caliber

automatic pistol and a .32 caliber pistol. R 736-37. Surrett saw Boyd again on the

---

treatment of the issue on appeal.  Doc. 27 at 151.  He adds that the Alabama Supreme Court's
consideration of the issue on appeal without proper factual development deprived him of the ability
to fairly litigate the claim and was unreasonable in every respect.  There is nothing in the record to
indicate that the petitioner ever objected to or opposed in any way, the Alabama Supreme Court's
decision to raise the issue of probable cause *sua sponte*.  Moreover, the Alabama Supreme Court
ordered that the parties brief the issue of probable cause, "in fairness to the parties."

>    We take notice that the State prosecuted its case with extensive testimony,
> nearly unfaltering, almost exclusively directed at the proposition that the warrantless
> search of Boyd's Camaro was valid as an inventory. Boyd's objections at trial and
> rulings in response thereto were directed at the validity of the city's inventory
> policies. The briefs to the Court of Criminal Appeals and to this Court primarily
> address the propriety of the search as an inventory. Only in passing did the Court of
> Criminal Appeals suggest that the search could have been valid as a "vehicle search"
> based on probable cause. In fairness to the parties, this Court ordered briefing on the
> probable cause issue to supplement the briefs filed on appeal.

*Ex Parte Boyd*, 542 So. 2d at 1278.

189

night of March 27, 1986, the night after the Blackmons disappeared, when Surrett

went to Boyd's house to collect a debt. R 737-38. Boyd commented to him that he

could not believe how cold-blooded he (Boyd) was. R 739. Surrett joked about how

much money was lying on Boyd's coffee table, and Boyd told him that he got it from

Fred Blackmon.   R 739.   Surrett testified that Boyd admitted shooting Fred

Blackmon. R 741. Boyd told Surrett that Milstead had shot Evelyn. R 742. Boyd

detailed the rest of the crime for Surrett, including how they disposed of the

Blackmons' bodies. R 742.

In light of all the evidence against Boyd, the items found in his vehicle seem

to have had little significance. Boyd claims that:

> The prosecution relied heavily on this evidence during trial to tie
> petitioner to the scene and to argue that he was more culpable than the
> codefendant. No other physical evidence was found in Petitioner's
> possession. A state serologist testified that he detected blood on the
> clothes found in the car, although he could not determine whether it was
> of animal or human type. (R. 575). The prosecution focused on this
> evidence in its arguments to the jury. (R. 334-35).

Doc. 27 at 147-148. The evidence taken from Boyd's automobile was not necessary

to tie him to the scene, or to establish the level of his culpability. Boyd was

sufficiently tied to the scene by his own confession, his voluntary statements, and the

confession of Robert Milstead. The evidence found in Boyd's Camaro did no more

to tie him to the scene or incriminate him than it did Milstead, since both men

190

admitted to going to the Blackmon home together, and both admitted that they had

traveled in Boyd's car. Although the prosecution did mention the items found in

Boyd's automobile during its opening statement, it certainly did not "focus" on these

items.[65]

---

[65] The portion of the opening statement referenced by the petitioner reads as follows:

[The police] went to the area where Fred Blackmon was killed. They found .25 caliber hulls. They found thread samples, pieces of cloth, strips, just the little threads that run through them. They went at one point in time during their investigation to the home of Robert Milstead where they recovered an axe. When William Boyd was arrested by the Anniston Police, his car was seized and inventoried, and in it they found some cloth and found some clothes. Their investigation led them to the area where the guns were thrown. He took them there, and they recovered two guns less than two feet from one another. One of them was a .25 automatic.

That wouldn't be so significant, you know, if they just found all that stuff and weren't able to do much with it. Through the pathologist who performed the autopsies on Fred Blackmon and Evelyn Blackmon, they recovered the ligatures that tied Evelyn Blackmon's feet together off of her body. They recovered the gag and they recovered the blindfold off her head. They recovered the gag off Fred Blackmon. They took two projectiles out of Fred Blackmon. He was not shot through and through. They found, in addition to clothing and the cloth material in this defendant's car, some hair that was entwined in cloth. The bullets that were taken from Fred Blackmon and the hull that was found out where Fred Blackmon was killed were all fired from the same gun, a .25 automatic, that was recovered from a creek that he took them out to.

The cloth that held Evelyn Blackmon captive while she was being killed and the cloth that was used to gag Fred Blackmon matched the cloth they took out of his car. The hair that they found at the place where Evelyn Blackmon was murdered was matched to Evelyn Blackmon's hair that was taken from her during the autopsy. They made another match of that hair with hair they found in [Boyd's] car. The axe that was recovered had some paint on it. We've got some pictures of it. I think you'll be able to see the paint, blue paint. Guess where they matched the blue paint up? From the barrel.

We're required to prove beyond a reasonable doubt all the evidence of his guilt in this case. We expect the evidence will also show that William Glen Boyd is

191

For all of these reasons, any error by the trial court in admitting the items found in Boyd's automobile was harmless.

## V. CONCLUSION

Having carefully addressed each of the claims for habeas corpus relief asserted by the petitioner in this action, the court finds all claims either meritless or barred from consideration on one or more grounds.  None of the petitioner's claims entitles him to relief.  Therefore, the petition for writ of habeas corpus is due to be denied. An order in accordance with this Memorandum Opinion will be entered.

DONE this ___7th___ day of December, 2004.

C. Lynwood Smith, Jr.
United States District Judge

---

not only guilty, but that this was his idea.  He's the oldest of the two boys.  He's the only one that knew the Blackmon family.  He's the only one that had a motive besides the money, and he planned it.

R 333-35.

## APPENDIX I
### Indictment of William Glen Boyd

#### COUNT I

The Grand Jury of Calhoun County charge that, before the finding of this indictment, William Glen[1] Boyd whose true name is to the Grand jury otherwise unknown, did intentionally cause the death of Evelyn Holmes Caine Blackmon, by shooting her with a pistol, and William Glen Boyd caused said death during William Glen Boyd's abduction of, or attempt to abduct, Evelyn Holmes Caine Blackmon, with intent to inflict physical injury upon her, or to cause her death, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama.

#### COUNT II

The Grand Jury of Calhoun County further charge that, before the finding of this indictment, William Glen Boyd, whose true name is to the Grand Jury otherwise unknown, did intentionally cause the death of Fred Leonard Blackmon, by shooting him with a pistol, and William Glen Boyd caused said death during William Glen Boyd's abduction of, or attempt to abduct, Fred Leonard Blackmon, with intent to inflict physical injury upon him, or to cause his death, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama.

#### COUNT III

The Grand Jury of Calhoun County further charge that, before the finding of this indictment, William Glen Boyd, whose true name is to the Grand Jury otherwise unknown, did intentionally cause the death of Evelyn Holmes Caine Blackmon, by shooting her with a pistol, and William Glen Boyd caused said death during William Glen Boyd's abduction of, or attempt to abduct, Evelyn Holmes Caine Blackmon, with intent to terrorize her, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama.

#### COUNT IV

The Grand Jury of Calhoun County further charge that, before the

---

[1] Boyd's middle name is misspelled "Glen" throughout the indictment.

finding of this indictment, William Glen Boyd, whose true name is to the Grand Jury otherwise unknown, did intentionally cause the death of Fred Leonard Blackmon, by shooting him with a pistol, and William Glen Boyd caused said death during William Glen Boyd's abduction of, or attempt to abduct, Fred Leonard Blackmon, with intent to terrorize him, in violation of Section 13A-5-40(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama.

### COUNT V

The Grand Jury of Calhoun County further charge that, before the finding of this indictment, William Glen Boyd, whose true name is to the Grand Jury otherwise unknown, did intentionally cause the death of Evelyn Holmes Caine Blackmon, by shooting her with a pistol, and William Glen Boyd caused said death during the time that William Glen Boyd was in the course of committing a theft of One (1) 1985 Cadillac Eldorado Biarittz automobile, black in color, bearing Vehicle Identification Number 1G6EL5781FE667616, and to-wit: Five Thousand and no/100 ($5,000) Dollars of the lawful currency of the United States of America, a better description of said property being unknown to the Grand Jury, the property of Fred Leonard Blackmon, by the use of force against the persons of Fred Leonard Blackmon and Evelyn Holmes Caine Blackmon, another person present, with intent to overcome their physical resistances or physical powers of resistance, while the said William Glen Boyd was armed with a deadly weapon, a pistol, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama.

### COUNT VI

The Grand Jury of Calhoun County further charge that, before the finding of this indictment, William Glen Boyd, whose true name is to the Grand Jury otherwise unknown, did intentionally cause the death of Fred Leonard Blackmon, by shooting him with a pistol, and William Glen Boyd caused said death during the time that William Glen Boyd was in the course of committing a theft of One (1) 1985 Cadillac Eldorado Biarittz automobile, black in color, bearing Vehicle Identification Number 1G6EL5781FE667616, and to-wit: Five Thousand and no/100 ($5,000) Dollars of the lawful currency of the

United States of America, a better description of said property being
unknown to the Grand Jury, the property of Fred Leonard Blackmon, by
the use of force against the persons of Fred Leonard Blackmon and
Evelyn Holmes Caine Blackmon, another person present, with intent to
overcome their physical resistances or physical powers of resistance,
while the said William Glen Boyd was armed with a deadly weapon, a
pistol, in violation of Section 13A-5-40(a)(2) of the Code of Alabama,
against the peace and dignity of the State of Alabama.

## COUNT VII

The Grand Jury of Calhoun County further charge that, before the
finding of this indictment, William Glen Boyd, whose true name is to
the Grand Jury otherwise unknown, did intentionally cause the death of
Evelyn Holmes Caine Blackmon, by shooting her with a pistol, and
William Glen Boyd caused said death during the time that William Glen
Boyd was in the course of committing a theft of One (1) 1985 Cadillac
Eldorado Biarittz automobile, black in color, bearing Vehicle
Identification Number 1G6EL5781FE667616, and to-wit: Five
Thousand and no/100 ($5,000) Dollars of the lawful currency of the
United States of America, a better description of said property being
unknown to the Grand Jury, the property of Fred Leonard Blackmon, by
the use of force against the persons of Fred Leonard Blackmon and
Evelyn Holmes Caine Blackmon, another person present, with intent to
overcome their physical resistances or physical powers of resistance, and
at that time, caused serious physical injury or death to the said Fred
Leonard Blackmon, and to the said Evelyn Holmes Cain Blackmon,
another person present, in violation of Section 13A-5-40(a)(2) of the
Code of Alabama, against the peace and dignity of the State of Alabama.

## COUNT VIII

The Grand Jury of Calhoun County further charge that, before the
finding of this indictment, William Glen Boyd, whose true name is to
the Grand Jury otherwise unknown, did intentionally cause the death of
Fred Leonard Blackmon, by shooting him with a pistol, and William
Glen Boyd caused said death during the time that William Glen Boyd
was in the course of committing a theft of One (1) 1985 Cadillac
Eldorado Biarittz automobile, black in color, bearing Vehicle

Identification Number 1G6EL5781FE667616, and to-wit: Five Thousand and no/100 ($5,000) Dollars of the lawful currency of the United States of America, a better description of said property being unknown to the Grand Jury, the property of Fred Leonard Blackmon, by the use of force against the persons of Fred Leonard Blackmon and Evelyn Holmes Caine Blackmon, another person present, with intent to overcome their physical resistances or physical powers of resistance, and at that time, caused serious physical injury or death to the said Fred Leonard Blackmon, and to the said Evelyn Holmes Cain Blackmon, another person present, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama.

CR 5-7.

**APPENDIX II**
**TRIAL JUDGE'S WRITTEN SENTENCING ORDER**

FINDINGS OF FACT BY THE COURT FROM THE EVIDENCE AND
TESTIMONY PRESENTED DURING THE GUILT PHASE OF THE TRIAL

After consideration of the evidence and testimony presented before the Court
during the guilt phase of the trial in this cause, the Court finds as follows:

On March 26, 1986, Evelyn Holmes Caine Blackmon and Fred Leonard
Blackmon resided as husband and wife at 401 Fairway Drive, Anniston, Alabama,
Calhoun County.   Julie Greenwood, Mrs. Blackmon's daughter by a previous
marriage, also lived with them.  Julie last saw her mother and Fred Blackmon alive
on the morning of March 26, 1986, at their home prior to her (Julie) going to school.

On that same morning William Glen Boyd (a former boyfriend of Julie's) and
Robert Denton Milstead drove to a place near the home of Evelyn and Fred
Blackmon. They were in Boyd's white 76' Camaro automobile.  Boyd told Milstead
to go to the house and tell Evelyn that he (Boyd) had arranged for Julie to be
kidnaped, that he was on a rampage, that he wanted to talk to her, and that when she
let him in, he (Milstead) was to leave the back door unlocked so he (Boyd) could slip
in.  After Milstead got inside the home, Boyd did slip in the back door, armed with
a pistol. After some conversation and threats, Boyd tied up Evelyn and told Milstead,
who was also armed, to watch her.  Boyd then forced Fred to go with him.

Later that morning, at 9:15 a. m., Linda Jenkins, an operations officer at 1st

Alabama Bank of Anniston approved and cashed a $5000.00 check for Fred Blackmon at a drive in window at the bank. She testified that a white, slender male with long, dark hair was in the car with Mr. Blackmon. In a short while Boyd and Fred Blackmon returned to the house. Boyd had a large amount of money and took $1500.00 from Fred's billfold. Boyd also took a necklace of Evely''s and ripped two phones from the wall. Boyd and Milstead then forced Evelyn and Fred to leave with them in a 1985 Cadillac belonging to Fred. The auto was an Eldorado Barritz with VIN# 1G6EL578FE667616[,] Alabama License tag number 11-p-2864.

The Court further finds, from the evidence and testimony, that Boyd and Milstead took the victims in Fred's car to an area on the west side of the Coosa River where Boyd took Evelyn into a thicket where he gagged her, and while she was bound and gagged, he attempted to knock her out by hitting her in the face and on the head with a large limb. Having failed to knock her out — even though her face was crushed — he pulled out a pistol and shot her in the neck and head. She continued to struggle and Boyd shot her again in the back.

The third shot killed her and Boyd threw some limbs on her and left.

Boyd and Milstead then drove Fred Blackmon back across the river into Calhoun County to another remote area and Boyd took Fred into the woods while Milstead remained near the car a short distance away. Boyd tried to knock out Fred

Appendix II - Page 2

by hitting him in the head with a long stick.  When he failed to knock him out he told

Milstead, "Get me the gun out of the back seat", whereupon Milstead obliged and

while Fred was begging Boyd not to kill him, Boyd said he "had to", and shot Fred

Blackmon in the neck causing him to fall and roll toward the water.  Boyd drug Fred

to the back of the Cadillac and when he saw he was still alive, he shot him in the

chest area again.  Boyd and Milstead then put Fred's body into the trunk of the

Cadillac, drove back to near the Fairway residence of the Blackmons and retrieved

Boyd's car.  Later they took the Cadillac—with Fred's body still in the trunk—back

to the Ohatchee area and left it in a grocery store parking lot until that evening.  That

afternoon Milstead purchased two blue 55 gallon drums with a locking top at a

salvage store in Bynum, Alabama.  Later that night Boyd and Milstead took the

Cadillac back to a boat ramp area on the west side of the river and Boyd let the car

windows down, put the car in gear, turned off the lights, and ran it out into the river

approximately 30 feet from shore where it sank below the surface.  Boyd then wanted

to dispose of Evelyn's body that night, but Milstead was too scared to go into the

woods.

They threw the guns used to kill the Blackmons into a creek off a bridge.  They

were later recovered and identified.

The next morning Boyd and Milstead returned to where Evelyn's body had

been left. Boyd kicked Evelyn and seeing that she was stiff, got an axe from the truck and attempted to chop her body at the lower back area so that it would go in one of the drums. Having failed to chop her in two, Boyd then pulled her legs backward toward her head until her backbone broke. Boyd said (according to Milstead, and the Court so finds) "he had to make her fit into the drum someway". They then put her mutilated body in the blue drum, piled in some rocks to weight it down, sealed the top, and Boyd chopped holes in the drum to let in water; then they threw the drum into the river a short distance (approximately 12 feet) from the shoreline of the river.

Lt. Carroll of the Anniston Police Department testified he talked with Boyd on two (2) occasions: April 3, 1986, and April 11, 1986. The Court finds that the Defendant, William Glen Boyd, while not represented by an attorney, freely, voluntarily and having full knowledge and understanding of his rights, waived his rights to silence and to an attorney and admitted to Lt. Carroll that he and Robert Denton Milstead robbed, abducted the victims (Fred and Evelyn Blackmon) and that he was present when both victims were tied up, gagged, beaten and killed.

The Court further finds that the police, in their investigation, recovered from the crime scenes two (2) spent shells of the same caliber as the murder weapons, some hair identified by John Case, a criminalist, as being the same as Evelyn Blackmon's, broken red glass later matched to Fred's Cadillac, some pieces of cloth and string that

Appendix II - Page 4

were the same kind of cloth as the clothes on Evelyn's body when it was recovered, hair from the trunk of the Cadillac was identified as Fred's. These items of evidence tended to connect the Defendant to the crimes.

Dr. Embry, toxicologist, testified that the cause of death of Evelyn Blackmon was multiple gun shot wounds.

Dr. Schurman, toxicologist, testified that the cause of death of Fred Blackmon was gun shots to the chest and neck.

Kenny Surrett testified, and the Court so finds, that Boyd called him to come to his house because he wanted to tell him something. When Surrett got to Boyd's house, he saw a lot of money on a table. Boyd told him that he got it from Fred Blackmon, and that he (Boyd) did not realize how cold-blooded he was. He admitted killing Fred and said that Milstead killed Evelyn; however, the Jury convicted Boyd of killing both victims and the Court so finds.

The Court having considered all the testimony and all the evidence, both for the State and the Defendant, William Glen Boyd, finds that William Glen Boyd, actively participated in the robbery and kidnaping of Fred and Evelyn Blackmon, and that during, or in the course of said robbery and kidnaping, that the Blackmons were shot, beaten and killed, (hair and fiber evidence, together with a necklace identified as Evelyn's found in the Defendant Boyd's car, a white Camaro, at the time of his

Appendix II - Page 5

arrest support this.)

The Court further finds that the Defendant, Boyd, attempted to hide, and ultimately destroy the bodies of the deceased, together with the vehicle of Fred Blackmon and the guns (pistols) used to kill the victims.

## FINDINGS CONCERNING THE EXISTENCE OR NON EXISTENCE OF AGGRAVATING CIRCUMSTANCES

In accordance with mandate of Sections 13A-5-45 and 13A-5-47 Code of Alabama, 1975 (as amended), the Court makes the following findings in regard to the aggravating circumstances set out by Section 13A-5-49 Code of Alabama, 1975 (as amended). The Court finds as follows:

(1) That the Capital offense was not committed by a person under sentence of imprisonment.

(2) That the Defendant had not been previously convicted of another Capital felony, and had not been previously convicted of a felony involving the use of threat of violence to another person.

(3) The acts allegedly committed by the Defendant in the instant case were not ones that created a great risk of death to many persons.

(4) The Capital offense was committed while the Defendant was engaged in the commission of, or flight after committing or attempting to commit Robbery and

Kidnaping.

(5) The Capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(6) The Capital offense was not committed for pecuniary gain.

(7) The Capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(8) The Capital offenses were especially henious [sic], atrocious, or cruel when compared to other Capital offenses. The Court reaches the conclusion that this aggravating circumstance exists based upon the interpretation of the aggravating circumstances as made by the Alabama Court of Criminal Appeals and the Supreme Court of Alabama in defining heinous, atrocious or cruel, and evidence of the following:

(a) That Defendant invaded the privacy of the victims, threatened to kill their daughter (and step-daughter), robbed them, kidnaped them at gun point from their home, bound and gagged them, took them to a remote area and abused both of them while they were fighting and begging for their lives.

(b) The Defendant inflicted severe pain and suffering upon both victims by hitting them on the head and in the face with a large limb while they were tied up and blindfolded.

Appendix II - Page 7

(c) The Defendant shot each victim two or three times after physically abusing them.

(d) The Defendant used an ax to cut Evelyn Blackmon so that her body would go into a 55 gallon drum.

(e) The Defendant bragged about the killings and about how cold blooded he was.

By any standard acceptable to a civilized society, these crimes were extremely wicked and shockingly evil. They were purpetrated [sic] with a design to inflict a high degree of pain with utter indifference to the suffering of the victims. The Court recognizes that all Capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness and cruelty in these offenses far exceeds that which is common to all Capital offenses. No other aggravating circumstances are found by the Court to exist in this case.

The Court makes the following findings under Sections 13A-5-50 and 13A-5-51 Code of Alabama, 1975 (as amended) in regard to mitigating circumstances. The Court finds that:

(1) The Defendant has a significant history of prior criminal activity, as shown by the pre-sentence report introduced into evidence with no objection from the Defendant.

Appendix II - Page 8

(2) The Defendant was not under the influence of extreme mental or emotional disturbances during the commission of the Capital offenses charged in this case.

(3) The victim was not a participant in the Defendant's conduct.

(4) The Defendant was not merely an accomplice in the Capital offenses committed by another person, further the Defendant's participation was not relatively minor.

(5) The Defendant did not act under extreme duress or under the substantial domination of another person.

(6) The Defendant did have the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

(7) The Defendant was twenty (20) years of age at the time of the commission of the crime charged.

The Court further finds that the Defendant, William Glen Boyd, to some degree assisted the law enforcement officers in locating the bodies of the victims and the weapons used in the crime. The Court has considered this as a non-statutory mitigating circumstance.

In addition to the above, the Court has considered the evidence and testimony presented to the jury and to the Court in regard to the Defendant's background and character as the same pertains to the mitigating circumstances that should be properly

considered by the Court.

The Court finds that the jury in this case was not emotionally influenced with passion, prejudice or other arbitrary factors in arriving at its findings of guilty as to the Capital offenses. As to the recommendation of punishment of life without parole, the Defendant, his sister and his mother made highly emotional pleas against the death penalty, the State presented no testimony in the sentence recommendation hearing. The Court further finds that if the jury was emotionally influenced with passion as a result of this testimony, it was all in favor of the Defendant as was evident from the jury's advisory verdict of life without parole.

After due consideration of all the matters that were presented to the Court during this hearing, both in mitigation and aggravation, the Court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case, and has given consideration to the recommendation of the jury contained in its advisory verdict, and has taken into consideration all other matters that are properly before the Court, including the pre-sentence report and the arguments of the State and the Defendant. While the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the Court's consideration, this Court does now find, and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances of this horrible, cold blooded crime as shown and

brought before the Court far outweigh the mitigating circumstances shown to the Court, and that said aggravating circumstances outweigh the said mitigating circumstances in all regards and that they are sufficient in both quantity and quality to more than uphold a sentence of DEATH in this case.

**IN THE CIRCUIT COURT OF CALHOUN COUNTY, ALABAMA**

| | |
|---|---|
| STATE OF ALABAMA, | ) |
|     Plaintiff, | ) |
| vs. | )     **CASE NO. CC-86-454** |
| WILLIAM GLEN BOYD, | ) |
|     Defendant. | ) |

**ORDER OF THE COURT ON IMPOSITION OF SENTENCE**

The Defendant in the above-styled case, William Glen Boyd, was charged by

Indictment returned by the Grand Jury of Calhoun County, Alabama, during its April,

1986, session, with eight (8) counts of Capital Murder as codified in Section 13-5-40,

Code of Alabama, 1975 (as amended). More specifically, the Defendant, William

Glen Boyd, was charged with the following Capital Offenses:

Two counts of Murder during a Kidnaping in the First Degree of Evelyn
Blackmon;

Two counts of Murder during a Kidnaping in the First degree of Fred
Blackmon;

Two counts of Murder of Evelyn Blackmon during a Robbery in the First
Degree;

Two counts of Murder of Fred Blackmon during a Robbery in the First Degree.

This case came on to be heard before the Court and a Jury of five women and

seven men (and two alternate Jurors who were discharged according to law) duly

impaneled and sworn as required by law; whereupon the principal jurors after hearing

Appendix II - Page 12

the evidence, the Court's charge as to the applicable law, including the lesser included offenses of Murder, Kidnaping in the First Degree, Robbery in the First Degree and upon consideration of the law and the evidence, found the Defendant guilty of the Capital Offenses of Murder by the Defendant of Evelyn Blackmon during a Kidnaping in the First Degree or attempt thereof as charged in Counts I and III of the Indictment, guilty of the Capital Offense of Murder by the Defendant of Fred Blackmon during a Kidnaping in the First Degree or attempt thereof as charged in Counts II and IV of the Indictment, guilty of the Capital Offense of Murder by the Defendant of Evelyn Blackmon during a Robbery in the First Degree as charged in Counts V and VII of the Indictment, and guilty of the Capital Offenses of Murder by the Defendant of Fred Blackmon during a Robbery in the First Degree as charged in Counts VI and VIII of the Indictment. The Jury, upon request of the Defendant, was polled as to its Verdict and the Verdict was determined to be unanimous.

The Court announced the Jury Verdict on March 20, 1987, and the Court then, in accord with the Jury Verdict adjudged the Defendant, William Glen Boyd, guilty of eight (8) counts of Capital Murder as charged in Counts I, II, III, IV, V, VI, VII, VIII of the Indictment.

The Court commenced a punishment phase hearing before the same Jury as required by Section 13A-5-46, Code of Alabama, 1975 (as amended). After hearing

evidence during the punishment phase the Jury was again charged as to the applicable

law advising said jury if the mitigating circumstances outweighed the aggravating

circumstances proven by the State beyond a reasonable doubt, then punishment would

be life imprisonment without eligibility for parole, but if the aggravating

circumstances proven by the State beyond a reasonable doubt outweighed the

mitigating circumstances as shown by the Court's charge, then the verdict should be

death. The jury was further charged that they must avoid any influence from passion,

prejudice or sympathy to enter into their verdict one way or the other. Both the State

and the Defendant's attorneys advised the Court they were satisfied with the Court's

charge to the jury.

After due deliberation, the Jury returned a Verdict fixing the Defendant's

punishment at life without parole. The body of the Verdict stated that the vote was

five votes in favor of Death and seven for life without parole in accordance with

Section 13A-5-46(f), Code of Alabama, 1975 (as amended).

After the jury verdict was returned and read in open court, the Court set a

formal hearing for April 9, 1987, at 9:00 a. m. At said hearing the Defendant, his

attorneys, Grant Paris, Stephen Levinson, and Mannon Bankson were present. Robert

Field was present for the State.

The Court has ordered and received a written pre-sentence investigation report

Appendix II - Page 14

and has conducted an additional sentence hearing pursuant to Section 13A-5-47, Code of Alabama, (Recomp. 1975). At the sentence hearing, the State, through its District Attorney offered the pre-sentence report into evidence, and the Court considered same, and urged that the Court fix the Defendant's punishment at death. The Defendant, through his counsel, argued that the Court should fix his punishment, in accordance with the jury's recommendation, at life in prison without parole.

ACCORDINGLY, IT IS ORDERED ADJUDGED, AND DECREED that the Defendant, William Glen Boyd, shall be punished by death by electrocution.

This the 29th day of April, 1987.

/s/ Signature
HAROLD G. QUATTLEBAUM
Circuit Judge